Timothy Duane ARCOREN,
Defendant/Appellant,

v.

UNITED STATES of America,
Plaintiff/Appellee.

No. 90–5277.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1990.

Filed April 8, 1991.

Rehearing Denied June 5, 1991.

---

Stanley Whiting, Winner, S.D., for defendant-appellant.

David Zuercher, Asst. U.S. Atty., Pierre, S.D., for plaintiff-appellee.

Before LAY, Chief Judge, HEANEY and FRIEDMAN,* Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

In this appeal from the United States District Court for the District of South Dakota (Porter, C.J.), the appellant (Arcoren) challenges his convictions of two counts of aggravated sexual abuse, 18 U.S.C. §§ 1153 & 2241(a)(1) (1988), one count of abusive sexual contact, 18 U.S.C. §§ 1153 & 2244, and one count of sexual abuse of a minor, 18 U.S.C. §§ 1153 & 2243. Arcoren also challenges his sentence as not in compliance with the sentencing guidelines. We affirm the convictions of aggravated sexual abuse and abusive sexual contact, and the sentences imposed for those offenses. We vacate the conviction of sexual abuse of a minor, and remand for a new trial on that count.

I.

A. Arcoren's convictions stem from events occurring on September 17, 1989 at his apartment in St. Francis, South Dakota, which is on the Rosebud Indian Reservation. Viewing the facts most favorably to the government, which is the standard on appeal from criminal convictions, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Bonadonna*, 775 F.2d 949, 950 (8th Cir.1985), there was evidence from which the jury could have found the following:

After attending a dance and doing some drinking, Arcoren, an American Indian, returned to his apartment around 3:00 a.m., accompanied by his nephew, brother, and four young girls—including Charlene Bordeaux (Bordeaux), Arcoren's wife's fifteen-year-old niece. Arcoren's pregnant wife, Brenda Brave Bird (Brave Bird), from whom he had separated two days before, was not in the apartment. Arcoren and Bordeaux went into the bedroom while the others remained in the living room, where they drank beer and played the stereo.

At approximately 5:00 a.m., Brave Bird arrived at the apartment and, after a brief argument with Arcoren, left. Arcoren returned to the bedroom and had consensual sexual intercourse with Bordeaux. Brave Bird later returned to the apartment, discovering Arcoren and Bordeaux in the bedroom. Arcoren forcefully pulled Brave Bird into the bedroom; verbally and physically abused her; prevented Brave Bird and Bordeaux from leaving the bedroom; and, for the next several hours, forced both women to have sexual intercourse with him.

Later in the morning, while Arcoren slept, Brave Bird left the apartment in Arcoren's car, flagged down a police officer, John Two Eagle, and reported the assaults. At his instruction, Brave Bird then went to the hospital for medical treatment, where she told a nurse and attending physician about the beatings and rapes. At the hospital, Brave Bird also described the assaults to Phillip Charles, a criminal investigator with the Bureau of Indian Affairs.

Three days later, Brave Bird testified before a South Dakota federal grand jury, describing in detail Arcoren's violent sexual and physical assaults of both herself and Bordeaux.

---

* DANIEL M. FRIEDMAN, Senior Circuit Judge, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Arcoren was indicted on four counts of aggravated sexual abuse by use of force, 18 U.S.C. §§ 1153 & 2241(a)(1), and one count of sexual abuse of a minor, 18 U.S.C. §§ 1153 & 2243. Counts I and II charged Arcoren with aggravated sexual abuse of Brave Bird; Counts III and IV charged Arcoren with aggravated sexual abuse of Bordeaux; and Count V charged Arcoren with sexual abuse of a minor by knowingly engaging in a sexual act with Bordeaux.

After trial, the jury convicted Arcoren of aggravated sexual abuse of Brave Bird (Count I) and Bordeaux (Count III), of the lesser included offense of abusive sexual conduct toward Brave Bird on Count II, and of sexual abuse of a minor (Count V). It acquitted him of the aggravated sexual abuse of Bordeaux charged in Count IV. The court sentenced Arcoren to 400 months imprisonment on each of Counts I and III, 120 months on Count II, and 60 months on Count V, the sentences to run concurrently, and imposed a special assessment of $200.00.

B. At trial, Bordeaux testified that she and Arcoren had voluntary intercourse; that after Brave Bird arrived, Arcoren verbally abused and beat Brave Bird, and then forced both herself and Brave Bird to have sexual intercourse with him as the other watched. John Two Eagle, the police officer, testified that when Brave Bird stopped him on the morning of September 17th, she had a swollen face with a cut on the bridge of her nose, blood on her clothing, and was "really upset." According to Two Eagle, Brave Bird stated that Arcoren "had assaulted her most of the night, forced her to stay at the apartment there on the east side of town and raped her and that there was another girl there that was being forced to stay at the apartment by [Arcoren] and that he raped her, too."

Carol Edwards, the receiving nurse at the hospital emergency room, testified that upon arrival, Brave Bird was "crying and upset" and told her that she had been "beaten up twice and she had been raped twice...." Dr. Teresa Mareska, the treating physician at the hospital, testified that Brave Bird reported being "assaulted by an individual named Tim" and "forced in some sexual activities." Phillip Charles, the Bureau of Indian Affairs criminal investigator who interviewed Brave Bird at the emergency room, testified in great detail about Brave Bird's account of the violent physical and sexual assaults by Arcoren upon Brave Bird and Bordeaux.

When the government called Brave Bird as a witness, she recanted her prior grand jury testimony and denied that Arcoren had beaten and raped her. We discuss her recantation in Part II.A. of this opinion.

After using Brave Bird's grand jury testimony to impeach her trial testimony, the government introduced portions of the grand jury testimony, which were read aloud to the jury by the court reporter, as "substantive evidence." In this appeal, Arcoren has not challenged the introduction of that evidence.

Finally, Arcoren testified on his own behalf. He stated that although he had argued that night with Brave Bird over Bordeaux—during which time Brave Bird's nose was accidentally bloodied—they later made up and then had voluntary intercourse while Bordeaux was asleep. He also testified that the two women were free to leave at any time, and that he "did not make any sexual contact with Charlene [Bordeaux] whatsoever."

II.

A. As noted, at trial Brave Bird recanted her grand jury testimony. She denied Arcoren raped her, denied that she had seen Arcoren and Bordeaux have sexual intercourse, and stated that the cuts and bruises on her body resulted from an earlier motorbike wreck. When the government confronted her with her contradictory grand jury testimony, Brave Bird stated that she could not remember making the statements or that, where she did recall making them, they were incorrect. She stated that when she made the statements on September 17th accusing Arcoren of raping her, she was angry with Arcoren because "he was with another woman" and not "because he raped [her]."

The government then called an expert witness, Carol Maicky, to testify regarding "battered woman syndrome." She was a psychologist who had worked with battered women for 10 years and with rape victims for 14 years. The government gave the following reasons for offering the evidence:

> Your Honor, there are certain facts which the jury has before it from the testimony which we contend will go unnoticed by a lay jury unless put into a perspective by an expert. We're offering her opinion under Rule 702 to show that these particular facts, while [they] may seem insignificant by themselves when put together against a battered women syndrome would allow the jury to determine the credibility of her in court testimony ... and help them determine which of the two diametrically opposed sworn statements of Brenda Brave Bird to believe.

After hearing Maicky's proffered testimony in chambers, the court, over defense counsel's objection, admitted the evidence. The court ruled that the evidence was admissible under Rule 702 of the Federal Rules of Evidence because it was "scientific, technical or other specialized knowledge [that] will assist the [jury] to understand the evidence or to determine a fact in issue" and that "the evidence would be more probative than prejudicial." The court, however, warned that Maicky could not "testify as to the ultimate fact that a particular party in this case, not the defendant, the party actually suffers from battered women syndrome. This determination must be left to the trier of fact."

In her testimony before the jury, Maicky generally described the battered woman syndrome. According to her testimony, which was based on her knowledge of the literature dealing with the subject and her professional experience, a "battered woman" is one who assumes responsibility for a cycle of violence occurring in a relationship, where the abuser (a husband or boyfriend) has told her that the first violent episode was her fault. Maicky described the syndrome's general characteristics to include (1) the belief that violence to the woman is her fault; (2) an inability to place responsibility for the violence elsewhere; (3) a fear for her life and the lives of her children; and (4) an irrational belief that the abuser is omnipresent and omniscient. According to Ms. Maicky, a battered woman develops coping mechanisms to deal with the ever-present violence, believing that by doing just one more thing she can stop the violence.

In accordance with the court's direction, Maicky expressed no opinion whether Brave Bird suffered from or displayed symptoms of the syndrome.

B. The district court admitted Maicky's testimony pursuant to Rule 702 of the Federal Rules of Evidence which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. *See* J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 702[02] at 702–30 (1988). The Advisory Notes to the Rule comment that "[t]he rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' " Fed.R.Evid. 702, Advisory Note.

Rule 702 is one of admissibility rather than exclusion. *See, e.g., Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.1990) ("Rule 702 was intended to function as a broad rule of admissibility."); *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989) ("A trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder."). "[T]he concept expressed by the Rules is sufficiently broad to embrace psychiatric and psychological testimony from

those who possess specialized knowledge concerning mental aberrations in human behavior, when such knowledge will help the jury to understand relevant issues in the case." *United States v. Barta*, 888 F.2d 1220, 1223 (8th Cir.1989).

 The jury in the present case was faced with a bizarre situation. Immediately after the rapes and assaults, Brave Bird had described them to the police officer whose car she flagged down, to the nurse and the doctor at the hospital where she had gone for treatment, and to a criminal investigator from the Bureau of Indian Affairs. Three days later, she described the rapes and assaults in detail in sworn testimony before the grand jury.

Four months later, at Arcoren's trial, she recanted her grand jury testimony. There she stated that she either did not remember statements to the grand jury or that, if she did remember them, the statements were incorrect and that some of them were things she had "made up". At trial, she also changed her explanation for the injuries to her leg she had suffered on September 18, 1989. Although she told the police officer, the nurse and doctors at the hospital, and the criminal investigator that Arcoren had inflicted those injuries when he beat her, at trial she testified that the injuries resulted from a motorbike wreck. She also testified that the reason she stopped the police officer after leaving Arcoren's apartment was because she had been driving 70 miles per hour.

A jury naturally would be puzzled at the complete about-face she made, and would have great difficulty in determining which version of Brave Bird's testimony it should believe. If there were some explanation for Brave Bird's changed statements, such explanation would aid the jury in deciding which statements were credible.

Maicky's expert testimony regarding the battered woman syndrome provided that explanation to the jury. As the witness told the jury, the syndrome is a psychological condition, which leads a female victim of physical abuse to accept her beatings because she believes that she is responsible for them, and hopes that by accepting one more beating, the pattern will stop. Maicky's testimony provided the jury with information that would help it to determine which of Brave Bird's testimony to credit. If the jury concluded that Brave Bird suffered from battered woman syndrome, that would explain her change in testimony— her unwillingness to say something damaging against her husband.

Maicky's testimony thus met the requirement of Rule 702 that "a witness qualified as an expert by knowledge, skill, experience, training or education" may testify with respect to "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." In permitting Maicky to testify, the district court ruled that she was qualified as an expert based on "a degree in psychology from the University of Michigan which is judicially noticed as a respected university plus the length of time of actual experience that she has had in this general field," and that the evidence would be "relevant and probative for the fact finders, the jury," to aid the jury in "pass[ing] upon the veracity or lack of veracity of the wife."

Apparently this is the first federal appellate case to consider the admissibility under Rule 702 of evidence relating to the battered woman syndrome. A number of state courts, however, have held such evidence admissible in cases in which the syndrome was relied upon to support the defense that the battered woman killed her husband or lover in self-defense. *See, e.g.,* *State v. Hennum*, 441 N.W.2d 793 (Minn. 1989); *Smith v. State*, 247 Ga. 612, 277 S.E.2d 678 (1981). In the *Hennum* case, on which the government relied in the district court as support for the introduction of Maicky's testimony, the Supreme Court of Minnesota stated that a number of courts in admitting the evidence "have held that battered woman syndrome is beyond the understanding of the average person and therefore expert testimony should be allowed." 441 N.W.2d at 798. The court also stated that "the theory underlying the battered woman syndrome is beyond the experimental stage and has gained a sub-

stantial enough scientific acceptance to warrant admissibility." *Id.* at 798–99.

Arcoren does not here challenge either the reliability or the general admissibility of battered woman syndrome evidence. Instead, he urges that introduction of such evidence should be limited to cases in which it is offered to bolster a claim of self-defense. There is no persuasive reason, however, for thus limiting it. The standard under Rule 702 for the admissibility of expert testimony is whether the "evidence will assist the trier of fact to understand the evidence or determine a fact in issue." If the expert testimony serves that end, it is immaterial whether the testimony is presented by the prosecution or by the defense. As a New Jersey appellate court stated, in affirming the admission of battered woman syndrome evidence offered by the prosecution, in a case where the wife was the complainant against her husband, "It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant." *See State v. Frost,* 242 N.J.Super. 601, 612, 577 A.2d 1282, 1287 (Ct.App.Div.1990).

This court has held expert testimony admissible under Rule 702 in other circumstances where the expert's specialized knowledge would assist the jury to understand the evidence. *See, e.g., United States v. Scavo,* 593 F.2d 837, 844 (8th Cir.1979) (bookmaker's statements "virtually incomprehensible to the layman, are fraught with meaning to a person familiar with gambling enterprises"); *United States v. Barletta,* 565 F.2d 985, 991–92 (8th Cir.1977) (conversations conducted in the "peculiar argot of bookmakers" require expert testimony "to be intelligible to the district court"); *see also United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (jury assisted by expert's description of "terms and practices" generally used in street narcotics deals); *United States v. Dawson,* 556 F.Supp. 418, 423 (E.D.Pa.1982), *aff'd,* 727 F.2d 1101 (3d Cir.1984) ("[E]xpert testimony is readily admissible to interpret and explain the use of code words and the meaning of certain language used in drug trafficking."). This principle is equally applicable to a situation where a psychologist testifies to "mental aberrations in human behavior, when such knowledge will help the jury to understand relevant issues in the case." *United States v. Barta,* 888 F.2d 1220, 1223 (8th Cir.1989). In this case, Maicky's testimony provided the jury with a basis upon which to understand and evaluate the changes in Brave Bird's testimony.

Arcoren also challenges the admission of Maicky's testimony on the ground that "the jury was in a better position than the government's expert to judge the credibility of Brave Bird." Maicky, however, expressed no opinion on whether Brave Bird suffered from battered woman syndrome or which of her conflicting statements were more credible. Maicky merely provided expert information to aid the jury in evaluating the evidence. Maicky's testimony did not interfere with or impinge upon the jury's role in determining the credibility of witnesses. *See United States v. Provost,* 875 F.2d 172, 175–76 (8th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989).

The decision whether to admit expert testimony ordinarily lies within the discretion of the trial court and will not be reversed unless there has been an abuse of discretion. *United States v. Rose,* 731 F.2d 1337, 1345 (8th Cir.), *cert. denied,* 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984). In the unusual circumstances of this case, the district court did not abuse its discretion in admitting Maicky's expert testimony regarding battered woman syndrome.

III.

A. Arcoren further challenges the introduction of Maicky's testimony on the ground that the government's failure to disclose prior to trial its intention to call her as a witness denied him due process.

Prior to trial, Arcoren filed a motion for discovery which, among other things, sought the names of all government witnesses. The court denied this request as outside the scope of discovery under Fed.R. Crim.P. 16(a). It ordered disclosure of other material sought, including the defendant's statements, exculpatory evidence, and scientific reports. Subsequently, Arcoren filed a motion to dismiss, alleging that the government had failed to comply with the discovery order. The court denied this motion on the first day of trial.

■ Arcoren argues that the "names of individual experts whom the Government intends to call as witnesses at the trial are discoverable to afford the accused and his counsel sufficient opportunity to properly prepare for trial". Criminal defendants, however, have no right in noncapital cases to disclosure of the names of government witnesses under Rule 16(a). *See United States v. Porter*, 850 F.2d 464, 465 (8th Cir.1988); *United States v. White*, 750 F.2d 726, 728 (8th Cir.1984).

■ Moreover, the record indicates that the government decided to call Maicky as a witness only after Brave Bird recanted on the first day of trial. One ground on which Arcoren objected to the proposed testimony of Maicky was that he had not been informed in advance that the government would be offering that evidence, which he suggested was covered by the discovery order requiring disclosure of scientific evidence. The prosecutor responded:

> I added this witness to the witness list on the morning of the trial. I thought there was a substantial likelihood that the witness was going to tell a different story before the Court in her testimony and determined that this type of evidence may be helpful. I met Carol Maicky for the first time this morning at approximately 8:00 o'clock.
>
> The first time I had any discussion with her at all was then. It appeared to me in what she was telling me that the characteristics of a battered woman would be helpful in helping the jury to evaluate testimony and I determined to call her.

In rejecting the objection, the court stated:

> it is difficult to assume that the witness is going to recant her testimony before the Grand Jury. Until that happens, why, assuming that this is offered on the, well, you have the veracity of the wife, Brenda. I don't find any violation of the discovery order for that reason that it's not been shown that the prosecution were absolutely—there was no question at all but when Brenda got on the stand she would recant everything she said to the Grand Jury. As a matter of fact in observing her I was, my impression was that the first three or four questions she was very calm and as a matter of fact testified and gave some testimony that was against the interest of the defendant. But then gradually she swung over and went the other way.

The government's calling of Maicky as an expert witness was a reasonable response to Brave Bird's recantation of her prior statements. Arcoren did not move for a continuance after the court ruled to admit Maicky's testimony. The government's nondisclosure of its intent to call Maicky as a witness did not deny Arcoren due process.

B. Arcoren also argues that the government failed to comply with the discovery order. In denying Arcoren's motion to dismiss, the district court concluded that the government "complied with the Court's discovery order by producing the laboratory test report to defendant's counsel on January 11, 1990 and agreeing to produce the requested witness statements." Order dated January 22, 1990.

Arcoren's argument here is but a reprise of his claim before the district court that the government failed timely to produce discovery material. The district court did not abuse its discretion in denying Arcoren's motion to dismiss based on the government's alleged noncompliance with the discovery order. *United States v. Krohn*, 558 F.2d 390, 394 (8th Cir.1977), *cert. denied*, 434 U.S. 868, 98 S.Ct. 207, 54 L.Ed.2d 145 (1977).

IV.

In her grand jury testimony, Brave Bird stated that a year before, on September 22, 1988, Arcoren had hit her with a baseball bat and broken her arm. At trial, she stated that she had not been afraid of Arcoren while she was in the bedroom with him and when she flagged down the policeman. She was then asked whether Arcoren had beaten her with a baseball bat on September 22, 1988. The district court overruled Arcoren's objection to the testimony. When she answered "no," she was confronted with her grand jury testimony that "he broke my arm with a bat back in September of '88," and acknowledged that she "must have" given "that testimony under oath" "if you've got it down."

Arcoren challenges the admission of this evidence as inconsistent with Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) provides that, although "[e]vidence of other crimes, wrongs or acts" is inadmissible to prove a person's character to show action in conformity therewith, it may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In this circuit, for other act evidence to be admissible under Rule 404(b):

(1) the evidence of the other act must be relevant to a material issue; (2) the other act must be similar in kind and reasonably close in time to the crime charged; (3) the evidence of the other act must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its prejudice.

*United States v. Estabrook,* 774 F.2d 284, 287 (8th Cir.1985).

■ Rule 404(b) is one of inclusion rather than exclusion, permitting the admission of other act evidence, unless the evidence tends to prove only the defendant's criminal disposition. *United States v. Gustafson,* 728 F.2d 1078, 1083 (8th Cir.), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *United States v. Wagoner,* 713 F.2d 1371, 1375 (8th Cir.1983). The district court has broad discretion in determining whether to admit other act

evidence, and its determination will be upheld unless there is an abuse of discretion. *Wagoner,* 713 F.2d at 1375.

■ One of Arcoren's defenses to the charges relating to Brave Bird was that she consented to sexual intercourse. Evidence that Arcoren hit her with a baseball bat a year before was relevant to that issue, since it suggested that any apparent consent by Brave Bird might have resulted from fear of bodily injury if she resisted. Moreover, since Brave Bird initially denied at trial that Arcoren had hit her, but had testified to the contrary before the grand jury, the evidence also was relevant to the credibility of her trial testimony generally. Arcoren has not shown that the evidence tended to prove only his criminal disposition. The district court did not abuse its discretion in admitting the evidence. *See United States v. Marshall,* 683 F.2d 1212, 1215 (8th Cir.1982).

V.

Arcoren requested the court to charge the jury that if it found the evidence "insufficient to establish beyond a reasonable doubt that the Defendant is guilty of the crime charged," then it "should go on to consider if the Defendant is guilty of an offense necessarily included in the offense charged," and that the crime charged in each count "necessarily includes the lesser offense of abusive sexual contact."

The court gave this instruction for Counts I and II (involving Brave Bird), but not for Counts III, IV and V (involving Bordeaux). Since the jury acquitted Arcoren on Count IV, the issue here is the propriety of the failure to give the instruction for Counts III and V.

■ Our standard is that:

A court should give a lesser-included offense instruction if: (1) a proper request is made; (2) the elements of the lesser offense are identical to some of the elements of the greater offense; (3) there is some evidence which would justify conviction of the lesser offense; (4) proof on the element or elements differentiating the two crimes is sufficiently in

dispute so the jury may consistently find the defendant innocent of the greater and guilty of the lesser-included offense; and (5) there is mutuality (a charge may be demanded by either prosecution or defense). *United States v. Neiss*, 684 F.2d 570, 571 (8th Cir.1982). When the evidence taken as a whole does not provide a rational basis for the jury to find the elements necessary to support the lesser-included offense instruction, the trial court may properly exclude such an instruction. *Id.*

*United States v. Eagle Hawk*, 815 F.2d 1213, 1215 (8th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 712, 98 L.Ed.2d 662 (1988). The government argues that requirement (4) has not been met because "[i]n this case the jury could not rationally acquit of the greater offense while convicting on the lesser...."

■ Count III charged Arcoren with aggravated sexual abuse by causing Bordeaux "to engage in a sexual act" by using force or by threatening her or placing her in fear of serious bodily injury, in violation of 18 U.S.C. section 2241. Count V charged him with engaging in a sexual act with Bordeaux, a person less than sixteen years old, in violation of 18 U.S.C. section 2243. The lesser-included offense on which Arcoren sought the instruction was that of having "sexual contact" with Bordeaux in circumstances where "had the sexual contact been a sexual act," it would have violated sections 2241 or 2243. The distinction drawn in the definitions section of the chapter containing these sections between "sexual act" and "sexual contact" is that the former generally requires genital penetration and the latter only the intentional touching of specified parts of the body. *See* 18 U.S.C. § 2245.

Our review of the record satisfies us that there was no basis upon which the jury rationally could have acquitted Arcoren of the charged offenses against Bordeaux, but convicted him of the lesser-included offenses involving sexual contact with her. Both Bordeaux in her trial testimony and Brave Bird in her grand jury testimony introduced at trial stated that Arcoren had involuntary sexual intercourse with Bordeaux, i.e., that he engaged in a "sexual act" with her. Arcoren denied having any "sexual contact with [Bordeaux] whatsoever." In her trial testimony, Brave Bird stated that she did not know whether Arcoren had sexual intercourse with Bordeaux, and that he did not have intercourse with Bordeaux "while I was present."

Thus, there was a sharp and direct conflict in the evidence on what occurred between Arcoren and Bordeaux. The prosecution's evidence was that Arcoren compelled Bordeaux to have sexual intercourse, and the evidence upon which Arcoren relied was that he had no intercourse at all with her.

If the jury had credited Arcoren's version it would have acquitted him of all charges involving Bordeaux. If, on the other hand, it credited the prosecution's evidence, it would have convicted him, since that testimony established that he engaged in a sexual act with Bordeaux. There was no rational basis, however, upon which the jury on the basis of the evidence before it could have credited that testimony, but concluded that Arcoren only had sexual contact, but did not commit a sexual act, with Bordeaux. The district court properly refused to give the lesser-included offense instruction with respect to the offenses involving Bordeaux.

VI.

Arcoren's conviction on Count V involved the charge of sexual abuse of a minor, in violation of 18 U.S.C. section 2243(a). That section also provides that it is a "defense" in a prosecution under that section:

which the defendant must establish by a preponderance of the evidence, that the defendant reasonably believed that the other person had attained the age of 16 years.

18 U.S.C. § 2243(c)(1).

In his redirect testimony, Arcoren attempted to demonstrate that he reasonably believed that Bordeaux was at least sixteen years old. The district court initially excluded the testimony on the ground that Arcoren's belief about Bordeaux's age was

irrelevant in light of his previous testimony that he "did not make any sexual contact with Charlene [Bordeaux] whatsoever." After Arcoren's offer of proof on this issue, the court again rejected the testimony, apparently because it considered the two defenses to be inconsistent, although it stated that "it is a fundamental rule that a defendant can have inconsistent defenses."

Arcoren here argues that the refusal to admit the testimony was reversible error. He also contends that the district court further erred in refusing to give the following jury instruction he proposed:

> In a prosecution for sexual abuse of a minor, it is a defense that the Defendant reasonably believed that the other person had attained the age of sixteen years.
>
> If you find that the Defendant reasonably believed that Charlene Bordeaux had attained the age of sixteen years, you should find the Defendant not guilty of sexual abuse of a minor as charged in Count V of the indictment.

■ A. "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988) (citing *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896)). The fact that the "recognized defense" may be inconsistent with another defense the defendant is asserting does not justify excluding evidence and failing to give an instruction on the "recognized defense". *See United States v. Fay*, 668 F.2d 375, 378 (8th Cir. 1981) ("defenses need not be consistent"); *Sherrill v. Wyrick*, 524 F.2d 186, 188 (8th Cir.1975), *cert. denied*, 424 U.S. 923, 96 S.Ct. 1134, 47 L.Ed.2d 332 (1976) ("defenses do not have to be consistent").

The Supreme Court applied this principle in *Mathews* to rule that "a defendant in a federal criminal prosecution who denies commission of the crime may nonetheless have the jury instructed, where the evidence warrants, on the affirmative defense of entrapment." 485 U.S. at 59, 108 S.Ct. at 884–85. The Court so held even though the two defenses were inconsistent "[b]ecause entrapment presupposes the commission of a crime" and "a jury could not logically conclude that the defendant had both failed to commit the elements of the offense *and* been entrapped." *Id.* at 63, 108 S.Ct. at 886–87 (emphasis in original). See also *Johnson v. United States*, 426 F.2d 651, 656 (D.C.Cir.1970) (*en banc*), where the defendant in a rape case was permitted to argue both that there had been no sexual intercourse and that the complainant had consented to intercourse, because "a defendant has the right to argue inconsistent defenses...." 426 F.2d at 656.

■ We therefore conclude that, even if Arcoren's defense that he reasonably believed that Bordeaux was at least sixteen years old was inconsistent with his claim that he had no sexual contact with her, that inconsistency would not bar him from introducing evidence to establish that he so believed. In fact, however, the two positions were not necessarily inconsistent.

Even if Arcoren's claim that he had no sexual relations with Bordeaux were accepted, that conclusion would not be incompatible with his asserted belief that she was more than fifteen years old. Indeed, the alleged inconsistency in those two positions appears to be lesser than the inconsistency between denying the offense and asserting entrapment involved in *Mathews* and between the denial of rape and the defense of consent involved in *Johnson*. There was no inconsistency between Arcoren's assertion (1) that he did not have sexual intercourse with Bordeaux and (2) that he reasonably believed that Bordeaux was at least sixteen years old. Since Arcoren presumably realized that the jury might not believe his claim of no sexual contact, it was appropriate and permissible for him to present to the jury his alternative claim that he reasonably believed that she was more than fifteen years old.

If Arcoren reasonably believed that Bordeaux was more than fifteen years old, he had a complete defense to the crime charged in Count V. By precluding him from introducing evidence to support that

claim, the district court prevented the jury from evaluating the claim. We cannot say that, if he had been permitted so to testify, the jury could not have believed him—particularly since two other witnesses testified that they believed that Bordeaux was more than sixteen years old.

The district court's exclusion of that testimony was reversible error, and Arcoren's conviction on Count V accordingly cannot stand. We therefore shall vacate that conviction and remand the case for a new trial on Count V, in which Arcoren may introduce evidence that he reasonably believed that Bordeaux was more than fifteen years old.

B. The district court's refusal to charge the jury with respect to Arcoren's reasonable belief that Bordeaux was more than fifteen years old presumably reflected the fact that, as a result of the court's exclusion of Arcoren's proposed testimony on the point, there was no evidence before the jury that could support the claim. Our holding that the refusal to admit the evidence was erroneous necessarily also undermines the refusal to charge. If, on the retrial of Count V, Arcoren introduces evidence from which the jury could conclude that he reasonably believed that Bordeaux was more than fifteen years old, a charge reflecting that defense should be given.

## VII.

Finally, Arcoren contends that the district court misapplied the sentencing guidelines by making the following upward adjustments in his offense level: (A) an increase of two levels, which section 3A1.3 mandates if the victim was "physically restrained in the course of the offense"; and (B) an increase of two levels, which section 2A3.1(b)(2)(B) mandates "if the victim was under the age of sixteen...."

A. Arcoren argues that the "testimony at trial take[n] in light most favorable to the Government does not support a physical restraint of either victim."

 The district court based the increase on "the Grand Jury testimony [of Brave Bird] as well as trial testimony that the Defendant placed his hand on the throat of Charlene Bordeaux and forced her to lie on the bed, as well as prevented [Brave Bird] from leaving the premises on at least one occasion." The court noted that "the evidence was that both girls were confined to the room," and that Arcoren "refused to let them out of the bedroom. And this constitutes physical restraint under the applicable guideline set out in the presentence report." The court's finding that both victims were physically restrained is not clearly erroneous.

Arcoren points out that the definition of "physically restrained" in section 1B1.1 of the guidelines, to which Application Note 1 to section 3A1.3 refers, is that " '[p]hysically restrained' means the forcible restraint of the victim such as being tied, bound, or locked up." He stresses that there was no evidence that either Brave Bird or Bordeaux was tied, bound or locked up.

The use in the definition of the words "such as" before those three terms indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint. *See United States v. Stokley*, 881 F.2d 114, 116 (4th Cir.1989). ("[A] victim need not be tied or bound up so that his movement is completely restricted....") The record here shows that Arcoren repeatedly pushed and grabbed Brave Bird and Bordeaux, preventing them from leaving the bedroom on numerous occasions. This is a sufficient basis to conclude that they were "physically restrained" under section 3A1.3. *See id.; United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990); *but see United States v. Myers*, 733 F.Supp. 1307 (D.Minn.1990) (although defendant, a Marine Corps sergeant, sat on top of victim, a fifteen year old girl, and repeatedly attempted to tie her wrists to bedpost, she was not "physically restrained" under section 3A1.3 since the defendant did not bind, tie or lock her up).

B. Arcoren's other argument on this upward adjustment of the base level of the offence is more complicated.

Section 2A3.1 of the guidelines provides a base offense level for criminal sexual

abuse of 27. It then provides, under the "specific offense characteristics" that if the offense "was committed by the means set forth in 18 U.S.C. § 2241(a) or (b) ... increase by four levels." Application Note 2 to section 3A1.3 states that the two-level upward adjustment "applies to any offense in which a victim was physically restrained in the course of the offense, except where such restraint is an element of the offense, specifically incorporated into the base offense level, or listed as a specific offense characteristic."

Arcoren argues that "[a]rguably any forcible rape under 18 U.S.C. Section 2241(1) or (2) constitutes some restraint since by definition force is used" and that the "guidelines punish this by adding four (4) points to this base level of 27 which substantially enhances the sentence." He apparently contends that his case comes within the exception of Application Note 2 to section 3A1.3—that the two-level increase if the victim is physically restrained during the offense is inapplicable where the restraint is "listed as a specific offense characteristic"—because the restraint of the victims in this case is taken care of in the four-level increase mandated for criminal sexual abuse where the offense is committed by the means specified in 18 U.S.C. 2241(a) or (b).

This court has not previously discussed in a published opinion the application of Application Note 2 to substantive offenses that may entail the use of force. The United States Court of Appeals for the Seventh Circuit, however, has dealt with the problem in *United States v. Tholl*, 895 F.2d 1178 (7th Cir.1990), and its analysis is helpful and convincing.

Tholl and his brother, posing as Drug Enforcement Administration (DEA) agents, staged bogus raids on drug dealers, pretended to arrest them and confiscated drugs and money. Tholl was convicted under 18 U.S.C. section 912 of obtaining money and property by impersonating a DEA agent. The district court increased Tholl's base offense level under a specific offense characteristic provision mandating enhancement "[i]f the defendant falsely represented himself as a federal officer, agent or employee to demand or obtain any money, paper, document, or other thing of value or to conduct an unlawful arrest or search...." Guideline § 2J1.4(b)(1). The court further enhanced the offense level under section 3A1.3 for restraint of victim.

Tholl challenged the increase in offense level for restraint of victim. He argued that the specific offense characteristic of impersonation, section 2J1.4(b)(1), included physical restraint because (1) that section authorizes an increase if the defendant falsely represented himself to conduct an unlawful arrest or search and (2) the act of "physical restraint" is inherent in an arrest. *Tholl*, 895 F.2d at 1184–85.

The court of appeals rejected that contention. It stated:

When the guidelines are viewed in their totality, it becomes clear that the "physical restraint" enhancement contained in section 3A1.3 had a very obvious purpose: the drafters of the guidelines intended that any offender who physically restrains his victim should receive a two-level offense increase over offenders who commit the same offense but do not restrain their victims. Those guidelines that do treat physical restraint as a specific offense characteristic mandate a two-level increase if physical restraint was used. Therefore, section 3A1.3 merely supplements the guidelines by mandating the same two-level increase for any offense where physical restraint was employed by the defendant, but was not listed as a specific characteristic of that offense.

. . . . .

When this underlying policy is understood and considered in light of the specific offense characteristic of Impersonation as worded in section 2J1.4(b)(1), it becomes clear that the customary two-level "physical restraint" enhancement was not taken into account in that section. First, while the drafters of the guidelines were careful to list expressly physical restraint as an offense characteristic of some offenses, ... it is not expressly listed as a specific offense

characteristic of Impersonation in section 2J1.4(b)(1). This failure to include a specifically defined term within the specific offense characteristic of Impersonation in section 2J1.4, while listing it in other specific offense characteristics, suggests that the omission was intentional. Moreover, while the specific offense characteristic for Impersonation does list "arrest," that term is not the functional equivalent of the sort of "physical restraint" as defined in section 1B1.1, Application Note 1(i) (defining "[p]hysically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up").

We agree with the district court that an arrest, as that term is used in section 2J1.4(b)(1), does not necessarily entail the sort of forcible physical restraint contemplated by section 1B1.1, Application Note 1(i).

895 F.2d at 1185 (footnote omitted).

Similar reasoning supports the district court's two-level increase for restraint of victim in this case.

■■■ As in *Tholl,* "physically restrained" is not a specific offense characteristic of Criminal Sexual Abuse in section 2A3.1(b). Other offenses are so characterized. *See, e.g.,* Guideline § 2B3.1(b)(4)(B) (Robbery); § 2E2.1(b)(3)(B) (Making, Financing, or Collecting an Extortionate Extension of Credit). This suggests that the offense level enhancement in section 2A3.-1(b) does not reflect physical restraint of the victim.

Although section 2A3.1(b) lists "the means set forth in 18 U.S.C. § 2241(a) or (b)"—i.e., force, threat, or other means—as a specific offense characteristic of Criminal Sexual Abuse, this does not necessarily include the physical restraint that section 3A1.3 covers. "Physically restrained," as used in the latter section, is defined as "forcible restraint of the victim ...." Guideline § 1B1.1. Thus, although "physically restrained" requires the use of force, use of force does not necessarily entail physical restraint. *See United States v. Myers,* 733 F.Supp. 1307, 1309 (D.Minn. 1990) ("An offender could easily use force,

such as by striking the victim, without restraining the victim in the manner covered by § 3A1.3."). This conclusion is similar to that in the guidelines applicable to other crimes of violence—crimes that by statute are committed by means of "force" or "threat"—which list "physically restrained" as a specific offense characteristic. See, for example, the Hobbs Act, 18 U.S.C. § 1951 (1988) (extortion by force or threat of violence), the guideline for which (section 2B3.2(b)(4)(B)) lists "physically restrained" as a specific offense characteristic and authorizes a two-level increase for such restraint.

The district court properly concluded that Arcoren "physically restrained" his victims during the offense, and correctly applied the two-level enhancement under section 3A1.3.

■■■ C. Arcoren argues that the district court misapplied guideline section 2A3.1(b)(2)(B), which mandates an increase of two offense levels "if the victim was under the age of sixteen...." He contends that "since 18 U.S.C. Section 2243 [sexual abuse of a minor] provides as a defense the issue of whether the Defendant reasonably believed that the other person was at least sixteen (16) years of age, ... the same analogy must apply" to the increase under section 2A3.1(b)(2)(B).

Nothing in section 2A3.1(b)(2)(B) even suggests that there is an implied exception to the two-level increase where the victim was less than sixteen years old if the defendant reasonably believed that the victim was at least sixteen. If the Sentencing Commission had intended such an exception, it presumably would have specifically so provided, as Congress did in 18 U.S.C. section 2243. Moreover, the latter section permits this defense only for the crime of sexual abuse of a minor with which Arcoren was charged only in Count V. It does not apply to the offense of aggregated sexual assault charged in Count III.

## CONCLUSION

The judgment of the district court is vacated insofar as it convicted Arcoren of

sexual abuse of a minor (Count V), and the case is remanded to the district court for a new trial on that count in accordance with this opinion. In all other respects, the judgment of the district court is affirmed.