# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2623

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Vernon Wilson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 14, 2012
Filed: August 2, 2012

_____

Before MELLOY, SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Vernon Wilson of four counts of deprivation of rights, in violation of 18 U.S.C. § 242, and two counts of making false statements, in violation of 18 U.S.C. § 1001. The district court[1] sentenced Wilson to 120 months' imprisonment on each of the § 242 counts, and 60 months' imprisonment on each of the § 1001 counts, with all terms to be served concurrently. In imposing this sentence, the court applied an enhancement for physical restraint under U.S.S.G. § 3A1.3, and an enhancement for aggravated assault resulting in serious bodily injury under

_____

[1]The Honorable Audrey G. Fleissig, District Judge for the Eastern District of Missouri.

U.S.S.G. § 2A2.2. On appeal, Wilson challenges the application of these two enhancements. We affirm.

I. *Background*

During his tenure as the chief administrator of the Washington County Jail in Missouri, Wilson either personally injured or caused the injuries of four prisoners between July 2005 and November 2005.

On July 27, 2005, a pretrial detainee, Jimmy Todd, attracted attention by yelling and generally being "annoying." The attending jailors informed Wilson about Todd's disruptive behavior. Wilson instructed the officers to move Todd to a special cell, designated "C tank." C tank was known as the "rougher tank" because it contained Thomas Mackley—a detainee who was known to be violent.[2] One officer questioned Wilson's order to place Todd in C Tank with Mackley. In response, Wilson pointed to his badge and said, "I'm the [expletive] Major."[3] Before the officers placed Todd in C Tank, Wilson spoke with Mackley. After the officers placed Todd in C Tank, Wilson said to the cell occupants, "Have fun, boys." Soon afterwards, Todd began beating on the door of the cell, pleading, "[g]et me out of here." The officers removed Todd from the cell and observed that his face was bloody and swollen. Wilson then asked Todd, "Did I get my point across?" Wilson later gave cigarettes[4] as a reward to Mackley and his cellmates who battered Todd.

On August 14, 2005, Jonathan Garrett, also a pretrial detainee, rapped and sang loudly. Corrections officers Valeria Wilson ("Valencia") and Jessica Reed asked

[2]The officers were detaining Mackley on murder charges and knew that he "liked to fight" and "beat[] the crap out of people."

[3]County jail employees referred to Wilson as "Major Wilson."

[4]According to former corrections officer Michael Hahn's testimony, inmates were prohibited from smoking.

Garrett to be quiet, but Garrett continued to rap loudly. Valeria called her father, Wilson, and explained to him the problem she was having with Garrett. Wilson later arrived at the jail with four officers. Wilson walked into Garrett's cell and stated, "Hello, I'm Major Vern Wilson. I run this jail." Wilson mentioned Valeria's relation to him and then proceeded to hit Garrett in the head four to six times, so that "almost after every strike [Garrett's] head bounced off the concrete wall that was behind him." Wilson then put his knee on Garrett's chest and yelled in his face.

On September 29, 2005, Gary Gieselman, another pretrial detainee, yelled and swore at Valeria. Valeria reacted by putting Gieselman in C Tank with Mackley. Valeria then told Wilson that Gieselman annoyed her. Wilson called Gieselman over and told him in front of the other prisoners, including Mackley, that his daughter Valeria was "not going to have any problems in his jail." Wilson then nodded his head and "smirked" at Mackley. After Wilson left, Mackley told the others in the cell that they would probably "be rewarded" if they assaulted Gieselman. After a brief discussion, several of the prisoners assaulted Gieselman. By the time they finished, blood covered Gieselman, and "[h]e could barely stand up." Gieselman's medical records showed that he sustained gross swelling in his face and eye, a lacerated lip, multiple facial wounds, and a swollen ear. A CT scan further showed a fractured orbital bone. In relation to this incident, inmate Rodney Rawlins testified that the prisoners had previously decided that they would not "beat up" Gieselman, unless Wilson stopped by the cell after Valeria. The next day, Wilson visited the cell and gave cigarettes to the prisoners who assaulted Gieselman.

On November 6, 2005, arrestee Billy Hawkins was "banging" and "clanging" on the cell door. Wilson walked up to Hawkins's cell and asked, "Do you know who the [expletive] I am[?]" Hawkins replied, "Yeah, you're the Major." Wilson then hit Hawkins in the face two to three times, beating his head against a concrete wall.

A former corrections officer in the jail, Michael Hahn, complained about Wilson's maltreatment of these prisoners. Based on these complaints, FBI Special Agent Patrick Cunningham began to investigate. As a part of his investigation, Special Agent Cunningham spoke to Wilson and informed him that he was investigating the possible abuse of Todd and Gieselman. In December 2008, Wilson made two false statements to Special Agent Cunningham about his involvement in the incidents involving Todd and Gieselman.

At the conclusion of the investigation, authorities arrested Wilson and charged him with four counts of violations of constitutional rights and two counts of making false statements. At his trial, jailers, inmates, and deputies with knowledge of the facts—including his daughter—testified about the four assaults. A jury convicted Wilson of all six counts.

At sentencing, the district court adopted the findings in the presentence investigation report (PSR) over Wilson's objection. The court applied a two-level enhancement for physical restraint under U.S.S.G. § 3A1.3. The court also applied the base offense level found in U.S.S.G. § 2A2.2 to two of the counts, as well as a five-level enhancement under § 2A2.2(b)(3)(B) for the assault on Gieselman that resulted in serious bodily injury. The district court sentenced Wilson to 120 months' imprisonment on each of the civil rights counts and 60 months' imprisonment for each of the false statements counts, with all the terms to be served concurrently.

## II. *Discussion*

On appeal, Wilson argues that the district court procedurally erred by applying the physical restraint enhancement under § 3A1.3 and using the aggravated assault guideline to determine the base offense level in counts 3 and 6; and alternatively applying the five-level enhancement in § 2A2.2(b)(3)(A) to counts 3 and 6. "We review de novo whether the district court correctly interpreted and applied the

sentencing guidelines, while the court's factual findings are reviewed for clear error." *United States v. Koch*, 625 F.3d 470, 480 (8th Cir. 2010).

"Procedural error includes failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quotations and citation omitted).

A. *Physical-Restraint Enhancement*

Wilson first argues that the district court erroneously applied the physical-restraint enhancement under § 3A1.3. Specifically, Wilson argues he did not forcibly restrain his victims—meaning that no forcible restraint was used beyond their lawful incarceration. He also argues that the district court's application of the enhancement in his case results in double counting under the Guidelines.

Section 3A1.3 of the Guidelines states, "If a victim was physically restrained in the course of the offense, increase by 2 levels." "Under the Guidelines, physically restrained 'means the forcible restraint of the victim such as by being tied, bound, or locked up.'" *United States v. Stevens*, 580 F.3d 718, 720 (8th Cir. 2009) (quoting U.S.S.G. § 1B1.1, comment. (n.1(K))).

We have applied § 3A1.3 in cases where the victims were confined to enclosed areas at the time that the defendant committed the underlying offense. In *United States v. Stevens*, we upheld a district court's application of the physical-restraint enhancement, where a bank robber had attempted to lock bank employees in a vault. 580 F.3d at 720; *see United States v. Schau*, 1 F.3d 729, 731 (8th Cir. 1993) (per curiam) (applying the physical-restraint guideline where a bank robber attempted to lock bank employees in a vault). In *Arcoren v. United States*, we upheld a district

court's application of the physical restraint enhancement where the defendant confined the victim to a bedroom. 929 F.2d 1235, 1246 (8th Cir. 1991). In *United States v. Aguilar*, we upheld a district court's application of the physical-restraint enhancement where the defendant confined the victim to a trailer. 512 F.3d 485, 488 (8th Cir. 2008).

Here, Wilson violated his victims' constitutional rights while they were confined and thus "locked up" in enclosed areas. Although Wilson's victims were lawfully incarcerated, the jury found that he purposefully moved Todd and Gieselman from cells where they were safe to the C Tank to be assaulted. At one point, Todd begged, "Get me out of here." In pleading for his release, Todd was not asking to be freed from incarceration but instead to be freed from the particular cell to which Wilson confined him with violent inmates who were motivated to harm him. Under these facts, we cannot say that the district court erred in applying the physical-restraint enhancement under § 3A1.3.

Wilson also argues that the district court's application of § 3A1.3 in this case results in double counting under the Guidelines because Wilson's sentence was also enhanced under § 2H1.1(b)(1)(A) and (b) because he acted under color of law as jail administrator. However, this court has previously rejected a similar argument. In *Stevens*, a defendant convicted of bank robbery argued that applying a physical restraint enhancement for brandishing a gun was necessarily double counting. 580 F.3d at 722. Rejecting this argument, this court stated,

> The specific offense characteristic punished by § 2B3.1(b)(4)(B) is the use of physical restraint, not the presence of a firearm. The firearm was merely a tool used to effect the physical restraint accomplished by [the defendants]. Thus, the district court's application of USSG § 2B3.1(b)(4)(B) to [the defendant's] armed robbery sentence did not implicate USSG § 2K2.4.

*Id.* Likewise, here, the specific characteristics punished by § 3A1.3 is physical restraint and not acting under the color of law to deprive a victim of a civil right. Although Wilson was chief administrator of the Washington County Kail, he could have acted under color of the law to deprive non-prisoners of his or her constitutional rights. For example, Wilson could have impermissibly detained a citizen outside of the jail while acting under color of the law and restraining them in the process. He could have also violated a fellow jail employee's civil rights and restrained them while doing so. Thus, the district court's application of § 3A1.3 in this case does not result in double counting. Likewise, Wilson could have assaulted and restrained the prisoners while wearing plain clothes and a mask hiding his face—making the under color of law enhancement inapplicable while the physical-restraint enhancement would still apply.

In sum, because Wilson moved his victims to an enclosed area to be assaulted, the district court did not err in applying the physical restraint enhancement.[5]

## B. *Aggravated-Assault Guideline*

Wilson next argues that the district court erred in using the base level in § 2A2.2 as well as the five-level enhancement in 2A2.2(b)(3)(B) for serious bodily injury to two of the counts for which he was convicted. Specifically, Wilson contends that the district court did not have sufficient evidence to apply the serious bodily injury enhancement because the jury convicted him of bodily injury and not serious

---

[5]The district court stated that even if it had not applied the physical restraint enhancement, it would have applied the two-level vulnerable-victim enhancement under § 3A1.1(b)(1). Because Wilson does not challenge the vulnerable-victim enhancement, any alleged error would be harmless. *See United States v. Bassett*, 406 F.3d 526, 527 (8th Cir. 2005) (per curiam) ("The district court, however, announced an alternative (though identical) 90-month sentence . . . . We therefore conclude that the Sixth Amendment error did not affect the ultimate sentence and was harmless beyond a reasonable doubt.").

bodily injury. He also argues that the aggravated assault guideline should not apply because he did not intend to assault the prisoners.

Section 2A2.2(b)(3)(B) of the Guidelines states that if a victim sustained serious bodily injury, a court should add five levels to his or her base-offense level. The Guidelines define "serious bodily injury" as "'injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.'" *United States v. Thompson*, 60 F.3d 514, 518 (8th Cir. 1995) (quoting U.S.S.G. § 1B1.1, comment. (n. 1(j))).

Wilson argues that there was no evidence that he intended to commit the assaults. "[C]riminal intent may be inferred from circumstantial evidence." *United States v. Waldman*, 310 F.3d 1074, 1078 (8th Cir. 2002). The jury found Wilson guilty beyond a reasonable doubt of four counts of violating constitutional rights, two of which occurred at the hands of inmates. The district court could reasonably infer that the jury found that Wilson intended to harm Todd and Gieselman by placing them in the "rougher tank." Further, not only did Wilson insinuate that Mackley and the other prisoners should assault Todd and Gieselman, but he also rewarded them with cigarettes after each of the incidents. Under these facts, the district court did not err in finding that Wilson had the requisite intent to assault the prisoners.

Wilson also argues that insufficient evidence exists to support the district court's finding that Gieselman sustained serious bodily injury because the jury only convicted him of bodily injury. We have previously upheld a district court's application of § 2A2.2 where the victim required hospitalization after being knocked unconscious. *Id.* ("[The victim]'s injury required both hospitalization, albeit briefly, and involved the impairment of his mental faculties when he was knocked unconscious."). Moreover, in applying the enhancement, the district court—unlike a jury for conviction—need only find by a preponderance of the evidence that Gieselman sustained serious bodily

-8-

injury. *United States v. Encee*, 256 F.3d 852, 854 (8th Cir. 2001) ("The burden is on the government to demonstrate by a preponderance of the evidence that an increase to a defendant's base offense level is warranted.").

Here, Gieselman suffered serious injuries that "requir[ed] . . . hospitalization." *Thompson*, 60 F.3d at 518. Gieselman's injuries included facial swelling, a lacerated lip, multiple facial wounds, and a swollen ear. Gieselman also lost some range of motion in his jaw and suffered damage to his teeth. Finally, a CT scan showed that Gieselman sustained a fractured orbital bone. Under these facts, the district court did not err in finding that Gieselman sustained serious bodily jury.

In conclusion, we hold that the district court did not err in applying the aggravated-assault baseline or the five-level enhancement for a crime resulting in serious bodily injury under § 2A2.2.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____