John DYAS, a/k/a John L. Dyas, Appellant,

v.

UNITED STATES, Appellee.

No. 9845.

District of Columbia Court of Appeals.

Argued Dec. 7, 1976.

Decided July 25, 1977.

Rehearing Denied En Banc, Sept. 7, 1977.

Michael B. Waitzkin, Public Defender Service, Washington, D. C., for appellant.

Frederick H. Weisberg, Public Defender Service, Washington, D. C., also entered an appearance for appellant.

Andrea L. Harnett, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William J. Hardy, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, GALLAGHER and YEAGLEY, Associate Judges.

KERN, Associate Judge:

A jury convicted appellant of armed robbery, D.C.Code 1973, §§ 22–2901, –3202, and possession of a prohibited weapon, D.C.Code

1973, § 22–3214(b). Appellant contends now that the judgment of conviction and his sentence of ten to thirty years' imprisonment must be set aside because (1) the police procedure resulting in the complaining witness' identification of him was so deficient as to violate due process, and (2) various errors by the trial judge and the prosecutor during trial were so prejudicial as to require a new trial.

The complainant, Mr. Schools, testified that while he was pumping fuel oil from his delivery truck[1] parked in an alley behind 18th Street and Park Road, N.W., around 4 p. m. on March 31, 1974, appellant suddenly appeared and demanded at gunpoint all the cash he was carrying. Mr. Schools gave him $110 and appellant then ran down the alley and disappeared. Police officers arrived several minutes later and received a detailed description of the robber from Mr. Schools including the fact that the man had been wearing a gold earring.

Several days after the robbery, a Detective Mack, who was in charge of this particular robbery investigation, showed Mr. Schools an array of nine photographs. Mr. Schools selected the photograph of appellant who was the *only* person depicted in the array wearing an earring. On April 14th, Mr. Schools identified appellant in a lineup and subsequently identified him in court during the trial. Appellant now challenges this identification procedure which he claims was *tainted* by Mr. Schools' initial viewing of a suggestive photo array that resulted in a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

The defense prior to the trial sought unsuccessfully to bar both the in-court and the lineup identification of appellant by Mr. Schools. At the pretrial suppression hearing Mr. Schools and the two detectives assigned to the case, Klepfel and Mack, testified at some length concerning the identification process followed in this case. The trial court did order suppressed as evidence Mr. Schools' identification of appellant's "earring photograph" because the court concluded the array had been unduly suggestive (Record at 107).[2] However, the court found that Mr. Schools had an independent source of identification as an eyewitness based on his clear observation of appellant during the robbery (Record at 106) and therefore concluded that Schools' subsequent identifications of appellant at the lineup and in court were not tainted by his viewing of the impermissibly suggestive photographic array (Record at 107–08, 124).

Appellant now attacks this conclusion by the court, arguing that the lineup and in-court identifications by Schools did not rest upon what he had observed at the scene, but rather on the suggestive photo array he had viewed *after* the crime and *before* the lineup. The issue now is whether the trial court erred in its conclusion that Mr. Schools had an independent source of identification, thereby allowing his lineup identification into evidence and permitting him to identify appellant at trial.

■ The Supreme Court in *United States v. Wade,* 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), set forth the following test to be used under these particular circumstances:

> [W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or *instead by means sufficiently distinquishable to be purged by the primary taint.* (Maguire, Evidence of Guilt 221 (1959). [Emphasis added.]

1. The complainant was the owner of a fuel oil delivery company.

2. There are several transcripts in the record on appeal. "Record" refers to the transcript of portions of the suppression hearing held April 11, 1975, and the trial that occurred from April 14, 1975 to April 18, 1975. "Supplemental Record I" refers to other portions of the suppression hearing held before the trial judge on April 11, 1975, and "Supplemental Record II" refers to a hearing held before the trial judge on October 3, 1974.

The government must come forward with clear and convincing evidence that there is a independent source of identification based on the "totality of the circumstances" before the court can allow either subsequent lineup or in-court identification by the witness. *Manson v. Brathwaite,* —— U.S. ——, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Wade, supra,* 388 U.S. at 240, 87 S.Ct. 1926; *United States v. Gambrill,* 146 U.S.App.D.C. 72, 77, 449 F.2d 1148, 1153 (1971).

The Supreme Court has suggested the following factors to be considered by a court in determining whether identification testimony is admissible after there has been an unnecessarily suggestive identification of the accused:

[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. [*Manson v. Brathwaite, supra,* —— U.S. at ——, 97 S.Ct. at 2253, citing *Neil v. Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. 375.]

Applying these factors in this case, we are persuaded that the trial court did not err in admitting the lineup and in-court identifications of appellant. Mr. Schools testified (Record at 57, 67, 69, 71–2) that it was a clear day and he had no impediments to his observation of appellant during the two to three minutes they were confronting each other at a distance of three feet.[3] Mr. Schools gave a detailed and essentially accurate description of appellant at the scene of the crime. The record does reflect a discrepancy between the witness' *initial* description of appellant's height to police officers at the scene (Record at 311), and appellant's actual appearance at trial. The discrepancy, however, was explained adequately by Mr. Schools at trial when he testified that at the time of the offense, appellant was wearing platform shoes.[4] We note that less than two weeks lapsed between the crime and the lineup which was conducted in a proper procedural manner. Mr. Schools did not hesitate in his identification of appellant and the trial court found that at *no time did Mr. Schools* either identify another person as the perpetrator of the crime or fail to identify appellant. *Neil v. Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. 375. We are persuaded that the government met its burden of showing by clear and convincing evidence that an independent source of identification by the eyewitness existed. We conclude that these "indicators" of reliability are "[not] outweighed by the corrupting effect of the suggestive [photo array]." *Manson v. Brathwaite, supra,* —— U.S. at ——, 97 S.Ct. at 2253.

Appellant argued to the trial court that improper police procedure prevented him from presenting to the court at the suppression hearing significant evidence on the issue of independent source of identification. This argument rests entirely on testimony at the suppression hearing by complainant that he was shown *three* photographic arrays by the police (Record at 73–9). The first viewing, according to him, occurred on April 5, 1974, six days after the robbery and contained the suggestive pho-

---

3. We note that complainant was quite positive in asserting under oath that his identification of appellant rested on the latter's features, *viz.,* "eyes, high cheekbones, keen face" and not on the earring photograph shown to him. (Supplemental Record I at 29–30.) *See Neil v. Biggers, supra,* 409 U.S. at 201, 93 S.Ct. 375; *Conyers v. United States,* D.C.App., 309 A.2d 309, 311–12 (1973).

4. Although appellant asserts there were several other discrepancies between Mr. Schools' initial description of the robber and his testimony before the grand jury and at trial, we deem them to be so minor as to be immaterial.

tograph of appellant wearing a gold earring. He testified that a second array was shown to him by plainclothes police officers at a gas station some days later, before the lineup, and he was unable to select anyone in that array of photographs. (Record at 85.) Mr. Schools testified that a third array was shown to him after the lineup and although he was not sure where the viewing occurred, he selected the picture of a man whom he thought was appellant wearing a "corn row" hair style. (Supplemental Record I at 33–4.) The government was unable to account for and produce either the second or third arrays at trial. (Record at 127.) Detective Mack testified that he showed Mr. Schools *only one* array (Supplemental Record I at 40) and that he did not know of any other police officer who might have shown an array to Mr. Schools. The trial court concluded, upon hearing all the evidence, that the only array shown to Mr. Schools (Record at 131) was the one he had suppressed as evidence. Under the circumstances the trial court is best equipped to assess the credibility of the witnesses and its finding that the detective did not show other arrays to Mr. Schools nor could he locate an officer who might have shown the arrays, is not clearly erroneous and will not be disturbed on appeal.[5] *United States v. Gambrill, supra; Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

We turn now to the improprieties asserted by appellant to have occurred at trial. First, appellant argues the trial court deprived him of his constitutional right to present his defense by erroneously refusing to permit the jury to hear testimony from a psychology professor who was proffered as an expert witness on eyewitness identifica-

tion. The trial court so ruled after testimony by the witness (Supplemental Record II at 31) before the trial that "my testimony only would go up to [the] point of saying that eye-witness [*sic*] identification is not as simple as it looks, and not as simple as it is assumed to be in public conception" and "the point of the scientist is to point out that there are enormous complications in the process, that people are not aware of." (Supplemental Record II at 32.) The witness further testified out of the jury's presence that "scientific literature" supports the conclusion that one under stress does not make as good an observation as one not under stress, and that within hours after a criminal episode the ability to accurately remember details begins to rapidly decline." (Supplemental Record II at 20.) Moreover, the witness testified that once a person *publicly* announces an opinion he will be motivated to maintain it despite the existence of subsequent, contrary evidence (Supplemental Record II at 25–26), and that the suggestions from a person in authority can have a considerable effect on the identification process (Supplemental Record II at 26–7; emphasis added.)

The federal circuit court here has held in *Jenkins v. United States,* 113 U.S. App.D.C. 300, 306, 307 F.2d 637, 643 (1962), that expert testimony is admissible if it is "likely to aid the trier in the search for truth." See 7 Wigmore on Evidence § 1923 (3d ed., 1940). The admission of expert testimony is committed to the broad discretion of the trial court and a ruling either admitting or excluding such evidence will not be disturbed unless "manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962).

---

**5.** Appellant argues that it is particularly unfair that the trial court, as the finder of fact at the suppression hearing, rejected Mr. Schools' testimony that he had been shown a second and third array, and then the government presented to the jury and relied on Mr. Schools' *other* testimony that he was able to identify appellant as the robber. There was an obvious conflict between the government's witnesses concerning the number of photo arrays shown com-

plaint but defense counsel, apparently as a tactical decision, did not draw the jury's attention to this conflict in order to detract from the weight the jury might have given the complainant's other testimony concerning lineup and in-court identification. *Clemons v. United States,* 133 U.S.App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

■ McCormick on Evidence, § 13 at 29–31 (E. Cleary, 2d ed. 1972), sets forth the following subject matter and testimonial qualifications governing the admissibility of expert testimony: (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman* [emphasis added]"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth* [emphasis added]"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." We are persuaded that the subject matter of the proffered testimony is not beyond the ken of the average layman nor would such testimony aid the trier in a search for the truth thus we conclude the trial judge did not abuse his discretion in excluding this testimony. *Fennekohl v. United States*, D.C. App., 354 A.2d 238 (1976).

In *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir. 1973), the federal court of appeals for the Ninth Circuit held that expert testimony on the unreliability of eyewitness identifications in stressful situations was inadmissible because counsel through effective cross-examination would be able to present to the jury "any inconsistencies or deficiencies in the eyewitness testimony." The court placed primary emphasis on the "responsibility of counsel during cross-examination to inquire into the witness' opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention." *Id.* Thus the proffered testimony of the expert would not aid the jury in evaluating an eyewitness' identification simply because "the jury was 'superbly equipped' to evaluate the impact of stress . . . on the perception of the identification witness." *Id.*, the court quoting from *United States v. DeSisto*, 329 F.2d 929, 934 (2d Cir.), *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964).

Implicit in the holding of *Amaral* was that the subject matter of the proffered testimony of the expert, which was similar to that evidence offered here, was *not* beyond the ken of the average layman. Moreover, the expert's conclusion on the reliability of the eyewitness identification would not aid the jury in evaluating a witness' testimony because the jury would be able to assess the witness' credibility based on the "inconsistencies and deficiencies" brought out on cross-examination.

We conclude that the trial counsel had an adequate opportunity to fully explore Mr. Schools' perception and recollection of the incident and his ability to identify appellant and therefore the trial court did not abuse its discretion by rejecting the proffered testimony. *Jenkins v. United States*, 113 U.S. App.D.C. at 306, 307 F.2d at 643. *See United States v. Brown*, 501 F.2d 146, 150–51 (9th Cir. 1974), *rev'd on other grounds sub nom. United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). *People v. Lawson*, 551 P.2d 206, 208–09 (Colo.App. 1976).

■ The next error alleged to have been committed by the court was to indicate to the jury by facial expressions and other outward manifestations its disbelief of a defense witness during her testimony to the jury. The witness was a defense investigator who testified that she had stationed herself at a main intersection in Georgetown one afternoon and observed twelve males pass during a 90-minute period of time who were wearing earrings (Record at 235–43). Preliminarily, we have considerable doubt as to the probative value of her testimony and some hesitation whether it should have been admitted into evidence. Turning to appellant's argument we note that defense counsel made an objection to the court (Record at 245–46), as required by *Billeci v. United States*, 87 U.S.App.D.C. 274, 282, 184 F.2d 394, 402 (1950), and the trial judge subsequently pointed out in denying the defense motion for mistrial (Record at 269–71) that he turned away from the jury so as to avoid revealing his facial reaction to the witness' testimony. The

prosecutor asserted (Record at 246) that the court had turned away from the jury during this time. We are unable to say on this record in light of the assertions by the trial participants that it has been established the trial judge's behavior in this instance was obvious to the jury and therefore improper or prejudicial to the defense case.[6]

■ Appellant's next contention is that the prosecutor introduced during the trial evidence of another crime committed by appellant so as now to require a reversal and retrial. Defense counsel initially cross-examined Mr. Schools about the suggestive photographic array (Record at 214–17). He also questioned Detective Klepfel concerning the photographic identification process (Record at 223–39). On redirect examination of the detective, the prosecutor elicited the meaning of the term modus operandi, a term the witness had used in his testimony on cross-examination; the detective explained it was the source of the photographs police used in presenting a photographic array for viewing by an eyewitness to a crime. The detective testified that modus operandi was "where we keep pictures of men that have committed different types of crimes . . . like rape, robbery, so on" (Record at 229). The court sustained an immediate objection by defense counsel (Record at 230) but denied a motion for mistrial made the next day.

Ultimately, the court in its final charge to the jury specifically instructed that the reference by the detective to modus operandi was not to be considered as an indication that appellant had any record of previous crimes. Given the relatively attenuated

connection made by the detective in his testimony between appellant's photograph, as distinguished from the other photographs in the array, and the modus operandi file, and the court's curative instruction in its final charge,[7] we conclude the reference to the modus operandi file by the detective in his testimony was not so pointed as to cause prejudice and require a new trial for appellant.

Finally, appellant contends that the court erred in failing to order certain Jencks material[8] turned over to defense counsel for the purpose of enabling him to cross-examine the complaining witness. The court during trial conducted a hearing out of the jury's presence to determine the existence of Jencks' statements (Record at 174). Complainant testified he talked to three different persons about what had occurred during the robbery—the officer responding to the scene, Detective Mack and the prosecutor—and observed them writing as he talked. It was agreed, however, that the police officer who had first responded to the scene had written on the PD 251 Form "everything" complainant had reported there (Record at 185–86, 278–79) and this Form was made available to the defense. Detective Mack denied taking notes during his meeting with complainant (Record at 175) and the court credited the officer's testimony.

■ The court then reviewed at the bench the notes taken by the Assistant United States Attorney of his interview with complainant (Record at 177–79). The court characterized them as "longhand short notes," found them to be consistent

---

**6.** Appellant complains generally that (1) the court at times criticized defense counsel in front of the jury and in various ways interfered with his presentation of the defense case, and (2) the prosecutor persisted with examination of witnesses despite defense objections sustained by the court and also made extraneous prejudicial remarks. Our review of the record reveals that the trial, as is frequently the case when the advocates are resourceful and energetic, generated at times more heat than light and prompted remarks on occasion that might better have been unsaid. Nevertheless, the atmosphere created was not such as to have

denied appellant a fair trial or prejudiced the defense so as now to require a new trial.

**7.** We note that there was testimony presented in the defense case that appellant had in fact been in jail prior to the crime charged here (Record at 297). The trial court instructed the jury that appellant's prior incarceration referred to by the witness while responding to a question by defense counsel did not mean he had committed a criminal offense. (Record at 349–50.)

**8.** 18 U.S.C. § 3500 (1970).

with the complainant's testimony and concluded that they were the prosecutor's work product and hence not producible. The Supreme Court has recently rejected the contention that there is an attorney's work product exception to the Jencks Act, *Goldberg v. United States*, 425 U.S. 94, 108, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). Nevertheless, the trial court's ruling may be upheld because the attorney's notes of his interview with the complainant did not constitute a "statement" within the meaning of the Act.[9] The witness never asserted in his testimony (Record at 169) that he either approved or otherwise adopted what the prosecutor wrote down during the pretrial interview; 18 U.S.C. § 3500(e)(1) (1970). *See Goldberg v. United States, supra* at 110–11 n. 19, 96 S.Ct. 1338. Moreover, the notes taken by the prosecutor during his interview are "[t]ypical interview notes . . . selective [and] . . . episodic," *id.* at 126, 96 S.Ct. at 1355 (Powell, J., concurring) and hence are not a "substantially verbatim recital of an oral statement," 18 U.S.C. § 3500(e)(2). *See March v. United States*, D.C.App., 362 A.2d 691, 699 (1976). Accordingly, the court's refusal to invoke the Jencks Act as to these notes does not now require reversal.

Finding no error, appellant's convictions must be and hereby are

*Affirmed.*

---

**9.** The Jencks Act, 18 U.S.C. § 3500(e) (1970) defines a statement as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of said oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.