Gregory E. NIXON, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–760.

District of Columbia Court of Appeals.

Argued Sept. 10, 1998.
Decided March 11, 1999.

584

Andrew Phillip McGuire, for appellant.

Megan E. Hills, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Shanlon Wu, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, SCHWELB, Associate Judge, and BELSON, Senior Judge.

SCHWELB, Associate Judge:

The principal question presented in this domestic violence case is whether the trial judge committed reversible error by permitting the prosecution to introduce expert testimony on the subject of the battered woman syndrome [1] in order to explain, *inter alia*, the conduct of the complaining witness in response to the alleged battering. We hold that the judge did not abuse his discretion by admitting the challenged evidence.

### I.

Following a lengthy jury trial which began on February 23, 1996 and concluded on March 12 of that year, Gregory E. Nixon was convicted of assault with a dangerous weapon (ADW),[2] possession of a firearm during a crime of violence (PFCV),[3] simple assault,[4]

1. The "battered woman syndrome" (BWS) has been described as "a series of common characteristics found in women who are abused both physically and emotionally by the dominant male figures in their lives over a prolonged [period] of time." *People v. Ellis*, 170 Misc.2d 945, 650 N.Y.S.2d 503, 505 (Sup.Ct.N.Y.Co. 1996) (quoting Christine Emerson, *United States v. Willis: No Room for the Battered Woman Syndrome in the Fifth Circuit?*, 48 BAYLOR L.REV. 317, 320 (1996)). For a more comprehensive definition of

this condition, *see* LENORE WALKER, PH.D, THE BATTERED WOMAN SYNDROME XV (1979), quoted in *Bechtel v. State*, 840 P.2d 1, 8 (Okla.Crim.App.1992).

2. D.C.Code § 22–504 (1996).

3. D.C.Code § 22–3204(b).

4. D.C.Code § 22–504.

and three additional weapons offenses.[5] Nixon was acquitted of twelve other counts of the eighteen-count indictment. On appeal, Nixon effectively concedes his guilt of the offenses arising from his possession of a pistol and ammunition, and he challenges only his convictions for ADW, PFCV, and simple assault.

Nixon's prosecution arose from his relationship with the complainant, Kelita Boyd, who was his live-in girlfriend, and who became the mother of his son, Amore. The evidence against Nixon consisted primarily of the testimony of Ms. Boyd (which was corroborated in part by Ms. Boyd's mother and by several other witnesses) and the expert evidence of Dr. Mary Ann Dutton, a board-certified clinical psychologist. Nixon appeared as a witness on his own behalf and generally denied Ms. Boyd's allegations.[6]

A. *The evidence of abuse.*

Ms. Boyd testified that she began to live with Nixon in December 1994. She related that soon thereafter, Nixon began to isolate and intimidate her, and that he attempted to exercise control over her and dominate her with respect to virtually every facet of her life. According to Ms. Boyd, Nixon sought to prevent her from having any meaningful contact with her family or friends, and he enforced this regime with threats and abuse and, eventually, with acts of violence.

Ms. Boyd testified that on one occasion, when her mother called on the telephone, Nixon pulled the telephone cord out of the socket.[7] On other occasions, Nixon turned up the stereo when members of Ms. Boyd's family called, and the music became so loud that the caller was compelled to hang up. Ms. Boyd's aunt testified that she had to use a "code" in order to leave a message for her niece.

Ms. Boyd related that Nixon repeatedly accused her of having affairs with other men and threatened her with retribution. In February 1995, Ms. Boyd discovered that she was pregnant with Amore. After she disclosed her pregnancy to Nixon, the intimidation intensified, and Nixon began to abuse her physically. On at least two occasions, Nixon struck or punched Ms. Boyd in the face; he then told her that he had not hit her, but that she had turned her head into his hand. According to Ms. Boyd, Nixon also pushed her against the wall, sliced her T-shirt with a knife, and engaged in other assaultive or threatening behavior.

In March 1995, after Nixon had pulled the telephone out of the socket, Ms. Boyd's mother and uncle visited the apartment in the company of two police officers. Ms. Boyd had the opportunity to talk to the officers privately, but she told them that Nixon had not harmed her. Ms. Boyd explained at trial that she did not tell the police or her family about the abuse because she was afraid and embarrassed, and because she believed that disclosure would be futile.

In April 1995, following an argument, Nixon punched Ms. Boyd in the face and made her nose and mouth bleed. A few days later, Ms. Boyd encountered her mother at a metro station, and the two women had lunch. On this occasion, Ms. Boyd admitted to her mother that, as her mother had suspected, Nixon had been beating Ms. Boyd. Ms. Boyd then moved in with her mother.

On May 28, 1995, Amore was born prematurely and was placed in intensive care. Nixon importuned Ms. Boyd to return to him and to reunite the family. In late June, Ms. Boyd, apparently believing Nixon's assurances that he would not abuse her any more, moved in with him again. She testified, however, that by the following month, Nixon was again battering her, now more violently than before the baby was born. In July, Nixon choked Ms. Boyd, making her nose bleed and causing her to lose consciousness. Nixon also threatened to kill Ms. Boyd's mother if

---

5. Carrying a pistol without a license (CPWOL), D.C.Code § 22–3204(a); possession of an unregistered firearm (UF), D.C.Code § 6–2311(a) (1995); and possession of ammunition for an unregistered firearm (UA), D.C.Code § 6–2361(3).

6. Several defense witnesses provided a measure of corroboration of some of Nixon's testimony.

7. Nixon acknowledged that this incident occurred, but stated that he did not want Ms. Boyd to continue the conversation because her relatives were being rude to him.

the mother ever brought the police to his home again. Subsequently, Nixon purchased a handgun, and in November 1995, according to Ms. Boyd, he threatened Ms. Boyd with the gun and with a knife. Soon thereafter, Ms. Boyd sought and secured a civil protection order against Nixon, and she moved to a transitional home for battered women.

### B.  *The expert testimony.*

· Following an *in limine* hearing outside the presence of the jury, the trial judge ruled that Dr. Dutton, the government's expert witness, would be permitted to testify regarding the following topics:

1.  myths about domestic violence;
2.  common patterns of battering; and
3.  common behavior of victims of battering.

At trial, Dr. Dutton addressed these subjects in some detail.[8] She described as a "common myth" regarding domestic violence the widespread belief that the victim can easily leave her abuser. This belief is unfounded, according to Dr. Dutton, because a battered woman will often fear that the batterer will use violence against her or her family if she does attempt to leave. Dr. Dutton also explained that many battered women are economically dependent on their abusers and lack the financial resources to set up households of their own. Moreover, women are often inhibited by personal shame or embarrassment. Dr. Dutton also testified that there is no empirical basis for the notion that battered women stay in abusive relationships because they "enjoy" the abuse.[9]

Focusing on the batterer, Dr. Dutton identified several common patterns of domestic abuse, including, *inter alia:*

1.  coercion and threats;
2.  emotional abuse, such as degrading or humiliating the victim;
3.  intimidation;
4.  isolation (*e.g.,* restricting the victim's access to the telephone or to the car, or monitoring her comings and goings); and
5.  minimizing the injury, or blaming the victim for being hit.

Dr. Dutton testified that by downplaying the victim's injuries and by isolating her from friends and family, the batterer often reinforces her feelings of helplessness and her tendency to blame herself for her situation.

Dr. Dutton then addressed common patterns of behavior on the part of victims of abuse. According to Dr. Dutton, the relevant studies show that approximately fifty percent of battered women do not report the abuse to the police, and that "[t]here are many women who unfortunately put on one front or one view for the world, even their family and friends, and in private experience the violence." Dr. Dutton stated that the term "cycle of violence" is used to describe the three stages of domestic violence—attention building, acute battering, and contrition. When the abuser appears to be contrite—when there are "apologies, flowers, I'm sorry, it was a mistake, it won't happen again"—and when he pleads for forgiveness, his victim often allows herself to be persuaded that the abuse will not recur. Moreover, abuse is not necessarily constant, for "most abusers aren't battering and mean and abusive one hundred percent of the time." Therefore, according to Dr. Dutton, it is more common than uncommon for a victim to leave the relationship, only to return. In particular, pregnancy and children can intensify the victim's attachment to the abuser and her reluctance to leave or to stay away.

Finally, Dr. Dutton testified that she had not examined either Nixon or Ms. Boyd. She did not know whether Ms. Boyd had been abused at all, or whether Nixon had abused her. Dr. Dutton therefore made it clear that

---

8.  In this opinion, we summarize only those parts of her testimony most relevant to the issues presented by this appeal.

9.  *See also* Joan M. Schroeder, *Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer,* 76 Iowa L.Rev. 553, 556, n. 25 (1991), in which the author opines that this perception may be prevalent: ("A common reaction to a battered woman's situation is [that] if she stays, she must like it.... The prevailing belief is that good wives would stop the beatings by changing their behavior to please men.... This myth blames the battered woman for the abusive relationship."). (Citations and internal quotation marks omitted.)

she was not rendering an opinion as to the guilt or innocence of the defendant.

## II.

## LEGAL DISCUSSION

On appeal from his convictions, Nixon challenges the admission of Dr. Dutton's testimony on several grounds, some of which his appellate counsel has raised for the first time on appeal. Before addressing each of Nixon's specific contentions, we first identify the applicable legal standard and the scope of appellate review.

### A. *The standard of review.*

▪ The criteria for the admission of expert testimony in the District of Columbia are set forth in a three-part test which was adopted by this court in *Dyas v. United States*, 376 A.2d 827 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977):

(1) the subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average [juror], (2) the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth, and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert

*Id.* at 832 (quoting EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 13, at 29–31 (2d ed.1972) (emphasis deleted; internal quotation marks omitted)). "The trial judge has wide latitude in the admission or exclusion of expert testimony, and his [or her] decision with respect thereto should be sustained unless it is manifestly erroneous." *In re Melton*, 597 A.2d 892, 897 (D.C.1991) (en banc) (quoting *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989)); *see also Ibn–Tamas v. United States*, 455 A.2d 893, 894 (D.C. 1983) (*Ibn–Tamas II* ) (recognizing discretion

of trial court regarding whether to admit expert testimony on BWS and holding that "this court should not substitute its judgment [for] such a discretionary ruling") (citation and internal quotation marks omitted). "Reversals for abuse are rare." *Melton, supra,* 597 A.2d at 897 (citation omitted; emphasis deleted).

▪ Where an issue is raised for the first time on appeal, we review only for plain error. *See* Super.Ct.Crim.R. 52(b). In order to satisfy this exacting standard, the defendant must demonstrate both that the error was "plain," in the sense of "clear" or "obvious," and that the challenged ruling undermined the fairness, integrity, or public reputation of the proceedings and resulted in a clear miscarriage of justice. *Johnson v. United States*, 520 U.S. 461, 465–70, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

### B. *The sufficiency of the Dyas hearing.*

▪ Nixon's first contention is that the trial judge did not make a sufficient inquiry to determine whether Dr. Dutton's proposed testimony satisfied the requirements of *Dyas*. Although Nixon, who is represented by new counsel on appeal, now claims that his trial attorney requested a more extensive hearing, he has failed to refer us to any place in the record in which counsel objected to the basic procedure utilized by the trial judge in determining whether Dr. Dutton should be permitted to testify. *See, e.g., Hunter v. United States*, 606 A.2d 139, 144 (D.C.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992) ("points not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal") (quoting *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)).[10] In order to prevail on this claim, Nixon must therefore demonstrate plain error.

In the present case, the trial judge held a proceeding *in limine* with respect to Dr.

---

**10.** Nixon's attorney did state that if Dr. Dutton was permitted to testify, then he would request an *in limine* hearing outside the presence of the jury with respect to any hypothetical questions,

based on the facts of the present case, that the prosecutor might wish to ask. The prosecutor propounded no such hypotheticals.

Dutton's proposed testimony [11] and, as we have seen, concluded that Dr. Dutton would be permitted to testify with respect to three specific subjects. The judge did not hold an evidentiary hearing on the issue, but Nixon concedes in his brief that "a trial court is not required to hold an evidentiary hearing in every case where an expert is proffered." *See, e.g., Ibn–Tamas II,* 455 A.2d at 893 n. 1. The judge also took judicial notice of, and adopted, the transcript of a *Dyas* hearing held by Judge A. Franklin Burgess, Jr. in *United States v. Darryl Drew,* Crim. No. F–4440–95. In that case, Judge Burgess examined in detail the question whether Dr. Dutton's proposed testimony on BWS and related subjects satisfied the *Dyas* standard.[12] Although Nixon's attorney argued that the facts of this case were different from those in *Darryl Drew,* he did not object to the consideration of the *Darryl Drew* transcript.

■ Under these circumstances, Nixon has not shown that the judge committed "obvious" error or that a miscarriage of justice occurred. We discern no plain error, or error at all.

### C. *"General acceptance."*

Nixon next contends that "the admission of Dr. Dutton's expert testimony was reversible error because the methodology behind 'battered woman syndrome' is not generally accepted." He relies on *United States v. Porter,* 618 A.2d 629 (D.C.1992), in which this court reiterated and expanded upon the seminal decision in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923):

> [U]nder *Frye,* the proponent of a new technology must demonstrate by a preponderance of the evidence that th[e] technology has been generally accepted in the relevant scientific community.... Given the requirement in *Frye* of general acceptance, [t]he issue is consensus versus controversy over a particular technique, not its validity.... If scientists significant either in number or expertise publicly oppose [a new technique] as unreliable, then that technique does not pass muster under *Frye.*

*Porter,* 618 A.2d at 633–34 (citations and internal quotation marks omitted).

According to Nixon's appellate counsel, "battered woman syndrome is nothing more than radical political feminism wrapped in the veneer of science, and as such, fails to satisfy the *Frye* test." Counsel cites a number of articles criticizing the methodology used by Dr. Lenore Walker, the author of THE BATTERED WOMAN SYNDROME, see note 1, *supra,*[13] and by other proponents of BWS, and contends that the consensus contemplated by *Frye* and *Porter* therefore does not exist.

■ Assuming, without deciding, that Dr. Dutton's testimony is subject to the *Frye* standard,[14] Nixon cannot demonstrate the lack of the requisite consensus on the present record. Nixon's attorney made no claim in the trial court that there are scientists who

---

11. The government states in its brief that the hearing lasted two hours.

12. In *Darryl Drew,* the judge held that the evidence satisfied *Dyas,* but deferred ruling with respect to its probative value and prejudicial effect until after the complainant had testified. The defendant subsequently entered a guilty plea, and the case never went to trial.

13. *See also Ibn–Tamas II, supra,* 455 A.2d at 894 (concurring opinion), in which Judge Gallagher quotes Dr. Walker's words in THE BATTERED WOMAN at p. XVII:

> [I] view women as victims in order to understand what the toll of such domestic violence is like for them. Unfortunately, in doing so *I tend to place all men in an especially negative light,* instead of just those men who do commit such crimes.

(Emphasis added by Judge Gallagher.)

14. The correctness of this assumption is debatable. *See Ibn–Tamas v. United States,* 407 A.2d 626, 638–39 (D.C.1979) *(Ibn–Tamas I)* (third *Dyas* criterion, based on Frye, "is directed to the general acceptance of generic categories of scientific inquiry," and not to whether there is "a general acceptance of the battered woman concept derived from [an accepted] methodology"); *State v. Borrelli,* 227 Conn. 153, 629 A.2d 1105, 1111 (1993) ("[w]e conclude that satisfaction of the *Frye* test is not a necessary precondition for the admission of expert testimony on battered woman's syndrome."); *but cf. Ibn–Tamas II, supra,* 455 A.2d at 894–96 (Gallagher, J., concurring) (Dr. Lenore Walker's proffered testimony on battered women "falls within the underlying [*Frye*] doctrine.").

dissent from BWS methodology, and the theory on which Nixon now relies is being presented for the first time on appeal.[15] If, under these circumstances, we may consider the contention at all, our review must be for plain error.

■ The trial judge was not "obviously" wrong in concluding that Dr. Dutton's testimony satisfied the third prong of *Dyas*. Contrary to Nixon's thesis, Dr. Dutton's testimony was not "junk science." *See State v. Clark*, 83 Hawai'i 289, 926 P.2d 194, 203 (1996). A decade ago, the Supreme Court of Washington held that the methodology in the diagnosis and treatment of battered women utilized by an expert witness who relied primarily on Dr. Lenore Walker's work "has received general acceptance in the community of mental health experts." *State v. Ciskie*, 110 Wash.2d 263, 751 P.2d 1165, 1170 (1988). As of 1992, the courts of thirty-two states had allowed the use of expert testimony on the subject of BWS. *See Bechtel, supra* note 1, 840 P.2d at 7 & n. 5. "The American Psychological Association, representing more than 55,000 psychologists, endorsed expert testimony on the syndrome in its amicus brief [in] *Hawthorne v. State*, 408 So.2d 801 (Fla.Dist.Ct.App.1982)...." *Id.* n. 4.[16]

More recently, the Supreme Court of Michigan has recognized that "the majority of jurisdictions favor the admissibility of expert testimony regarding the battered woman syndrome." *People v. Christel*, 449 Mich. 578, 537 N.W.2d 194, 202 n. 26 (1995) (cita-

tions and internal quotation marks omitted).[17] The court further stated that "Dr. Walker's premise and understanding of a battering relationship has been widely accepted throughout the United States, and we now join the majority of jurisdictions recognizing the discipline." *Id.* The Supreme Court of Minnesota has likewise stated that "battered woman syndrome has gained sufficient scientific acceptance to warrant admissibility as expert testimony." *State v. Grecinger*, 569 N.W.2d 189, 194 (Minn.1997) (citation omitted). In *Darryl Drew, supra,* Judge Burgess concluded, on the basis of "ample authority," that Dr. Dutton's proposed testimony in that case "meets the *Frye* test." At the very least, in light of the decisions in *Grecinger, Christel, Bechtel, Ciskie,* and *Darryl Drew,*[18] and the authorities relied on by the courts in those cases, the admission of Dr. Dutton's testimony was not plainly wrong and did not result in or threaten a miscarriage of justice.

D. *Dr. Dutton's qualifications.*

■ Nixon next contends that "[t]he admission of Dr. Dutton's expert testimony was reversible error because she was incapable of offering a reasonable opinion." He claims, *inter alia,* that "Dr. Dutton's feminist bias, as described above, is so severe as to disqualify her from testifying as an expert." A reading of Dr. Dutton's comparatively low-key testimony does not, in our view, reveal the prejudice or other shortcomings that counsel attributes to her.[19]

---

15. Rather than argue that there was no scientific consensus recognizing BWS, Nixon's trial counsel asserted that the syndrome was common knowledge: "With regard to batter[ed] woman syndrome ... the average laymen in the real world have [been] inundate[d] with a person getting beat up, a person ... not being able to leave, they read about [it] every day, they hear about it and they know about it." Because the defense never suggested that the existence of a consensus was at issue, the prosecution never had any occasion to gird for battle on the point.

16. The American Psychological Association also filed an amicus brief to the same effect in the Superior Court in the *Darryl Drew* case.

17. The court cited James O. Pearson, Jr., J.D., Annotation, *Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Woman Syndrome,* 18 A.L.R.4th 1153 (1982).

18. *But cf. Ibn–Tamas II, supra,* 455 A.2d at 893–94 (discerning no "manifest error" in the trial judge's determination, on remand from this court's 1979 decision in *Ibn–Tamas I,* that defendant had failed to establish "general acceptance" of BWS; *Fowler v. State,* 958 S.W.2d 853, 860–64 (Tex.Ct.App.1997) (prosecution failed to present sufficient evidence of the validity of methodology and scientific theories expounded by prosecution's expert; error was harmless), *review granted,* (Mar. 11, 1998).

19. Nixon's attorney also apparently wants this court to make what amounts to an appellate finding to the effect that Dr. Dutton's testimony was untruthful, that she violated ethical standards by giving her evidence, and that she should therefore have been barred from testifying. Our examination of the record does not support these most unfortunate and ill-advised *ad hominem* allegations.

Dr. Dutton, as we have noted, is an experienced psychologist. She has written and lectured widely on the subject of domestic violence. She testified that she had previously been qualified as an expert witness approximately seventy-five times. On their face, her qualifications appear unassailable.

At trial, after the prosecutor had questioned Dr. Dutton regarding her background and experience, he tendered her as an expert witness, and Nixon's attorney explicitly conceded her expertise:

MR. WU:[20] Your Honor, at this time, the United States would proffer Dr. Dutton as an expert in the field of domestic violence and the effects of battering.

THE COURT: Mr. Tun, any objection?

MR. TUN:[21] No, thank you, Your Honor.

THE COURT: The Court will accept Mary Ann Dutton as an expert in the field of domestic violence and the effects of battering.

Moments later, while reiterating other objections, Nixon's attorney again stated that he was not challenging Dr. Dutton's qualifications. Under these circumstances, we view as patently frivolous the notion that the judge plainly erred by failing, *sua sponte*, to reject Dr. Dutton as an expert witness.

E. *"Beyond the ken."*

Nixon next contends that "the admission of Dr. Dutton's expert testimony was reversible error because battered woman syndrome is not beyond the ken of the average layperson." Nixon made essentially the same claim in the trial court, and the issue has been preserved for appeal.

During the course of the trial, the defense repeatedly attempted to persuade the jury that Ms. Boyd's testimony was not credible. Nixon's counsel argued that for a long period, Ms. Boyd did not report, and even denied, the alleged abuse, and that her allegations were therefore belied by her own conduct. In his opening statement, Nixon's attorney told the jurors that there would be "no medical records ... no pictures ... no police reports of my client

beating up Miss Boyd." Counsel asked the jurors to ponder why. During his cross-examination of the complainant, Nixon's attorney focused on her failure to report or disclose the abuse. Subsequently, in closing argument, counsel suggested that the failure of Ms. Boyd (or her family) to report the alleged battering to the police "doesn't make sense."

Actions sometimes speak louder than words, and a lay juror might well wonder whether Ms. Boyd's actions (and inaction) at the time of the alleged abuse were consistent with the narrative which she provided in the courtroom long after the events occurred. Dr. Dutton's testimony was designed to apprise the jurors of certain repeated patterns of behavior on the part of many battered women. With that information, the jurors were in a better position to determine whether these patterns of behavior might explain any perceived discrepancy between Ms. Boyd's words and her deeds.

This court and other courts have held that testimony of the type provided by Dr. Dutton may assist the jury in understanding the evidence and is "beyond the ken" of the average lay juror within the meaning of *Dyas. See, e.g., Ibn–Tamas I, supra,* 407 A.2d at 635 ("[t]he substantive element of the *Dyas* ... test—'beyond the ken of the average layman'—is accordingly met here"); *Arcoren v. United States,* 929 F.2d 1235, 1240 (8th Cir.), *cert. denied,* 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991); *Grecinger, supra,* 569 N.W.2d at 193–94; *Christel, supra,* 537 N.W.2d at 203–04; *Borrelli, supra,* 629 A.2d at 1112; *Ciskie, supra,* 751 P.2d at 1166, 1170–74.

In *Borrelli,* the Supreme Court of Connecticut held that the testimony of the prosecution's expert on battered woman syndrome was "beyond the knowledge and experience of the average juror." 629 A.2d at 1112 (citation omitted). The court relied on empirical research indicating that

potential jurors may hold beliefs and attitudes about abused women at variance with the views of experts who have studied

---

20. Shanlon Wu, Esq., the prosecutor.

21. Harry Tun, Esq., Nixon's trial attorney.

or had experience with abused women. In particular, males are likely to be skeptical about the fear the woman feels in an abusive relationship and about her inability to leave a setting in which abuse is threatened.

*Id.* (quoting N. Vidmar & R. Schuller, *Juries and Expert Evidence: Social Framework Testimony,* 52 Law & Contemp.Probs. 133, 154 (1989)).

In *Ciskie* the defendant challenged the complainant's claims of abuse, arguing that she failed to seek medical attention, call the police, or leave the defendant, and that her behavior cast doubt upon her allegations. The Supreme Court of Washington sustained the trial judge's admission of testimony regarding the battered woman syndrome, reasoning that "[n]either logic nor law requires us to deny victims an opportunity to explain to a jury, through a qualified expert, the reasons for conduct which would otherwise be beyond the average juror's understanding." 751 P.2d at 1166. *Accord, Commonwealth v. Goetzendanner,* 42 Mass.App.Ct. 637, 679 N.E.2d 240, 244 (1997) ("[t]estimony concerning BWS could assist jurors in overcoming the common myth or stereotype that the victims of assaultive partners or spouses would naturally choose to end the relationship") (citations omitted).

■ It is true, as Nixon contends, that a great deal of information about battered women is reported by the media and has found its way into the public domain. In that respect, however, this case is not unlike *Irick v. United States,* 565 A.2d 26 (D.C.1989). In *Irick,* the trial judge had admitted, over objection, testimony regarding the association between drugs and firearms. On appeal, the defendant contended that the evidence was not beyond the ken of the average juror and should therefore have been excluded. This court disagreed:

Although the average reader of the daily press might well surmise, to quote Detective [Johnny St. Valentine] Brown,[22] that "when you relate to drugs and guns it's like a marriage," it was surely reasonable for the trial judge to conclude that an

expert's explication of the background of this melancholy proposition would be helpful to the jury.

*Id.* at 31. In this case, too, the judge could reasonably conclude, without abusing his discretion, that Dr. Dutton's testimony was beyond the ken of a lay trier of fact and would be helpful to the jurors in their consideration of the evidence.

F. *Relevance.*

Nixon also asserts on appeal, as he did in the trial court, that because "Dr. Dutton failed to examine or specifically diagnose Miss Boyd, her opinion regarding 'battered women' generally was irrelevant." The authorities on this issue, however, are uniformly to the contrary.

■ For expert testimony regarding BWS to be admissible, its proponent must, of course, lay an evidentiary foundation for his or her claim that the alleged victim is a battered woman. *Borrelli, supra,* 629 A.2d at 1115 n. 15; *Ellis, supra,* 650 N.Y.S.2d at 508–09. But if the jury credited Ms. Boyd, then there was ample evidence in the record that Nixon abused her, both physically and emotionally. Contrary to Nixon's assertion, the evidence that Ms. Boyd was a battered woman need not, and indeed ordinarily should not, come from the expert witness.

In *State v. Clark, supra,* the complaining witness had recanted her allegations of abuse. Over defense objection, the trial judge admitted testimony of an expert witness regarding domestic violence. The prosecution's expert described, *inter alia,* how such violence may explain a victim's recantation of her prior charges. At the time of her testimony, the expert had not met or examined the complainant. The defendant was convicted, and on appeal, he contended, as Nixon does in this case, that the expert testimony was irrelevant and lacked foundation. The Supreme Court of Hawaii disagreed:

Clark's contention that [the expert's] testimony regarding the recantation phenomenon of domestic violence was irrelevant, absent a determination by an expert that

---

22. Detective Brown was the prosecution's "drug    expert."

[the complainant] was in fact suffering from symptoms associated with domestic violence, is similarly without merit. Expert testimony regarding the effects of domestic violence and how it may explain a victim's recantation of abuse

> is *not* evidence that the victim suffers from a specific medical or psychological condition—or even that the victim's behavior as observed by the experts was consistent with the behavior of women suffering from such a condition. It is simply testimony, based on the witnesses' experience in cases of domestic violence, that women with a history of domestic abuse often exhibit common traits, among them denial and a tendency to recant accusations of abuse.

*State v. Schaller,* [199 Wis.2d 23] 544 N.W.2d 247, 253 (Wis.Ct.App.1995), *review denied by, State v. Schaller,* 546 N.W.2d 469 (Wis.1996). In the present case, therefore, it was appropriately left to the jury to determine [whether the complainant's] behavior was consistent with the behavior described by [the expert].

926 P.2d at 204.

Numerous other courts have likewise held that expert testimony regarding BWS and other aspects of domestic violence is admissible where the expert has not examined the complaining witness and has not testified that she is a battered woman or suffers from BWS. *See, e.g., Arcoren, supra,* 929 F.2d at 1241; *Grecinger, supra,* 569 N.W.2d at 194; *Goetzendanner, supra,* 679 N.E.2d at 245; *Scugoza v. State,* 949 S.W.2d 360, 363 (Tex. Ct.App.1997); *Christel, supra,* 537 N.W.2d at 201; *Borrelli, supra,* 629 A.2d at 1111; *Ellis, supra,* 650 N.Y.S.2d at 504, 507–08; Cynthia Lynn Barnes, J.D., Annotation, *Admissibility of Expert Testimony Concerning Domestic–Violence Syndromes to Assist Jury in Evaluating Victim's Testimony or Behavior,* 57 A.L.R.5th 315 (1998) (hereinafter "*Admis-*

*sibility of Expert Testimony* ").[23] Indeed, in most of these cases, the courts have held or suggested that testimony by the expert to the effect that the complainant was a battered woman should be excluded as unduly prejudicial and because it would invade the province of the jury. *See, e.g., Arcoren, supra,* 929 F.2d at 1241 (because the expert witness expressed no opinion as to whether complainant suffered from BWS or as to which of the complainant's conflicting versions of the facts was more credible, the testimony did not impinge upon the jury's role in determining credibility); *Grecinger, supra,* 569 N.W.2d at 194 ("the expert should not be permitted to testify on the ultimate fact of whether the particular [victim] actually suffers from battered woman syndrome"); *Christel, supra,* 537 N.W.2d at 201 ("the expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful"); *Borrelli, supra,* 629 A.2d at 1115 (expert did not testify "that the victim was in fact battered and therefore did not comment, directly or indirectly, on her credibility"); *State v. Griffin,* 564 N.W.2d 370, 374 (Iowa 1997) (citation and internal quotation marks omitted) ("[i]f the effect of the expert opinions in a case is the equivalent of opining on the truthfulness of the complaining witness, the testimony is not admissible"); *Goetzendanner, supra,* 679 N.E.2d at 245 (citations omitted) ("[t]he evidence may not relate directly to the symptoms exhibited by an individual victim or victim witness, nor may it include an opinion or diagnosis that the person suffers from the described condition"). In light of these decisions, any attempt by the prosecution to adduce expert testimony to the effect that Ms. Boyd was a battered woman would have injected into the record a significant possibility of undue prejudice.[24]

---

**23.** Judge Burgess ruled to the same effect in *Darryl Drew, supra* .

**24.** We need not and do not decide whether expert testimony that the victim was a battered woman may ever be admissible. *See, Ibn–Tamas I, supra,* 407 A.2d at 632–33 & n. 13 (proffered expert testimony of Dr. Lenore Walker, who had

examined a homicide defendant, and who proposed to testify as to the effects on the defendant of alleged battering by the defendant's decedent husband, would not violate "ultimate issue" rule or invade the province of the jury); *cf. Ibn–Tamas II, supra,* 455 A.2d at 893 (sustaining exclusion of Dr. Walker's evidence).

■ This case is not unlike *Hinnant v. United States*, 520 A.2d 292, 293–94 (D.C. 1987), in which this court affirmed the admission of expert testimony regarding the practices of drug traffickers although the expert did not state any opinion as to whether the defendant engaged in these practices. *See also United States v. Johnson*, 174 U.S.App. D.C. 72, 75, 527 F.2d 1381, 1384 (1976) (per curiam) ("the detective expressed an opinion as to the habits of narcotics dealers and users in general. He did not state any opinion as to whether appellant was a dealer."). Indeed, in sustaining the admission of BWS testimony, the United States Court of Appeals for the Eighth Circuit relied, in part, on federal decisions admitting expert evidence regarding the street practices of narcotics dealers. *Arcoren, supra*, 929 F.2d at 1241 (citations omitted). In this case, we conclude, as did the trial judge, that Dr. Dutton's testimony was relevant and that the prosecution had laid a sufficient foundation for its admission.

### G. *Limiting instruction.*

Nixon claims that reversal is required because the trial court failed to give the jury a limiting instruction regarding the purpose for which Dr. Dutton's testimony was received in evidence. Noting the trial judge's instruction on the subject in a Connecticut case,[25] Nixon argues that in the absence of such an instruction, "the jury may easily mistake the expert's 'general' case-specific testimony as a case-specific diagnosis or as substantive evidence that the defendant is a 'batterer.'" Although a limiting instruction might have been appropriate, Nixon's claim of reversible error is without merit.

■ "No party may assign as error any portion of the charge *or omission therefrom* unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of that objection."

Super Ct.Crim.R. 30 (emphasis added). At trial, Nixon's attorney made no request for the kind of instruction which he now claims to have been necessary. "A party's failure to object to an instruction before the jury begins deliberations as required by Super.Ct.Crim.R. 30, results in severe consequences on appeal [even] if that party might have been entitled to a different instruction." *Powell v. United States*, 684 A.2d 373, 379 n. 9 (D.C.1996). Rule 30 therefore bars Nixon's claim, at least in the absence of plain error and a clear miscarriage of justice.

■ Nixon has not made the requisite showing. In the present case, as we have noted, Dr. Dutton testified on direct examination that she had met neither the defendant nor Ms. Boyd and that she therefore had no opinion regarding Nixon's guilt. On cross-examination, Nixon's attorney elicited from Dr. Dutton, even more forcefully, exactly what testimony she did *not* give:

Q. Dr. Dutton, you don't know whether Ms. Kelita Boyd is an abused person, do you?

A. No, I do not.

Q. And, Dr. Dutton, you don't know that my client has ever abused or threatened Ms. Kelita Boyd, do you?

A. No, I do not.

\* \* \* \* \* \*

Q. So, just to conclude, you don't know anything about the specifics of this case; is that correct?

A. That's correct.

Q. Thank you. I have no further questions.

In light of these unequivocal statements on the part of the witness, the jury could not reasonably have understood Dr. Dutton to be testifying that Ms. Boyd was a battered woman or that Nixon was her batterer.

Nixon relies on *State v. Ellis*, 280 N.J.Super. 533, 656 A.2d 25 (App.Div.1995), but that case is plainly distinguishable and lends no

---

25. In that case, the judge charged the jury as follows:

You recall there were two witnesses who described in general terms the operation of the battered women's syndrome. This testimony that was offered by the witnesses was limited to that description. These individuals offered no opinion in this court and are not to be understood by you as having offered any opinion as to whether, in fact, [the victim] was suffering from the battered women's syndrome at any time relevant to this case.

*State v. Battista*, 31 Conn.App. 497, 626 A.2d 769, 779 n. 13 (1993).

support to Nixon's thesis. In *Ellis*, prior to testifying, the prosecution's expert witness had interviewed the victim for two and one-half hours. *Id.* at 29. Based on that interview and on documents relating to the case, the expert opined that "the victim's actions were consistent with those of someone suffering from Battered Woman's Syndrome." *Id.* Under New Jersey law, expert testimony concerning BWS had long been admissible, but "its application [was] limited to explaining a victim's reactions or late reporting of the events and not as evidence that the crime occurred." *Id.* at 30 (citations omitted). Nevertheless, and in spite of the expert's characterization of the victim's conduct, the judge failed to instruct the jury regarding the limited purpose for which the evidence could properly be considered. On these somewhat unusual facts, the appellate court concluded that

> the trial court erred in this case by failing to give the jury limiting instructions on the difference between substantive use and limited use of [the expert] testimony. The omission of limiting instructions was plain error since the jury certainly could have taken her testimony as evidence of defendant's guilt rather than the victim's credibility. Accordingly, this error was "clearly capable of producing an unjust result," and reversal and remand is warranted.

*Id.* at 31 (footnote omitted).

The critical difference between *Ellis* and the present case is readily apparent. In *Ellis*, the expert had effectively described the victim, whom she had interviewed and evaluated, as a battered woman. Without guidance from the judge, the jurors might readily believe, on the basis of the expert's testimony, that if the victim had been battered, then the defendant must have been her batterer. In the present case, on the other hand, Dr. Dutton's own words conclusively refuted any comparable interpretation of her evidence, and there was no appreciable danger of confusion. *Cf. Battle v. United States*, 630 A.2d 211, 224 (D.C.1993) (although the trial judge should have instructed jury as to the limited purpose for which rape victim's out-of-court complaint of rape had been admitted, the defendant was not substantially prejudiced, and there was no plain error).

### H. Probative value and prejudice.

Finally, Nixon claims that Dr. Dutton's testimony was more prejudicial than probative, and that it should have been excluded on that ground. In the trial court, he contended that her evidence was lacking in relevance and that it invaded the province of the jury, and we will treat the issue as having been preserved.

"[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C.1996) (en banc) (citations omitted); *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). Moreover, a party seeking to override the trial judge's exercise of discretion must show that the probative value of the evidence is *substantially* outweighed by its potential prejudicial effect. *Id.* at 1098–1101. Particularly where expert testimony is concerned, reversals on this ground do not abound. *Melton, supra,* 597 A.2d at 897.

In *Ibn–Tamas I*, this court recognized the centrality of Dr. Lenore Walker's testimony regarding BWS when such evidence was offered by a homicide defendant who claimed to have been battered by her late husband, the decedent, whom she was alleged to have murdered. 407 A.2d at 639. The court held, as a matter of law, that the probative value of the proposed testimony outweighed its potential prejudice. *Id.* The issue in the present case is somewhat different, for Ms. Boyd was a prosecution witness, and not the accused. Nevertheless, as the court explained in *Arcoren, supra,*

> [i]t would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant.

929 F.2d at 1241 (quoting *State v. Frost*, 242 N.J.Super. 601, 577 A.2d 1282, 1287 (App. Div.1990)).

Moreover, in those cases in which the courts have admitted (or sustained the admission of) expert testimony regarding

BWS at the behest of the prosecution, they have necessarily held, expressly or implicitly,[26] that the probative value of the evidence is not substantially outweighed by its prejudicial effect. In *Christel, supra,* the Supreme Court of Michigan held that the expert "cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful." 537 N.W.2d at 201. The court then stated that "[i]n most cases, these limitations dispel any fear of unfair prejudice." *Id.* at 201 n. 24. With virtual unanimity, other courts have agreed, *see Admissibility of Expert Testimony, supra,* 57 A.L.R.5th at 354–59 (collecting authorities), and so do we.

### III.

### CONCLUSION

 For the foregoing reasons, Nixon's convictions are hereby

*Affirmed.*[27]

---

**26.** We have, however, encouraged courts to be explicit in this area. *Cf. Ibn–Tamas I, supra,* 407 A.2d at 635.

**27.** Nixon's remaining contentions are without merit.

First, Nixon claims on appeal that his convictions for ADW and assault violate the Double Jeopardy Clause of the Fifth Amendment because a civil protection order (CPO) was previously issued against him. Nixon failed to raise this defense in the trial court, however, and he has therefore waived it. *See, e.g., In re J.A.H.,* 315 A.2d 825, 827 (D.C.1974). Moreover, a civil protection order is quintessentially remedial, *see Cruz–Foster v. Foster,* 597 A.2d 927, 929 (D.C. 1991), and thus does not implicate double jeopardy protections. *See, e.g., Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997) (criminal prosecution that follows imposition of civil fines is not barred by the Double Jeopardy Clause). Nixon also makes a related statutory argument, but the relevant statute plainly contemplates that criminal charges may be instituted by the government, and a civil suit for a CPO may be brought by the complainant, all on the basis of the same conduct. *See* D.C.Code § 16–1002(c) (1997).

Second, Nixon contends that the trial judge "coerced" the jury by accepting three successive partial verdicts and by then directing the jurors to continue to deliberate in spite of an indication of deadlock. We discern neither evidence of coercion nor abuse of discretion. *See Jackson v. United States,* 683 A.2d 1379, 1383–84 (D.C. 1996); *Chavarria v. United States,* 505 A.2d 59, 65 (D.C.1986); *Blango v. United States,* 335 A.2d 230, 234 (D.C.1975). Nixon's related complaint on appeal regarding the judge's phrasing of the "partial verdict" instruction comes too late, *see* Super.Ct.Crim.R. 30, and is without merit in any event.

Finally, Nixon asserts that the trial judge abused his discretion by denying Nixon's motion for a new trial, which was based on "newly discovered evidence." This motion was precipitated by Ms. Boyd's disclosure, at the time of Nixon's sentencing, that she had contemplated suicide and that she had dreamed about being beaten by Nixon. The trial judge did not abuse his discretion by concluding, *inter alia,* that at any new trial, this evidence was unlikely to produce an acquittal. *See, e.g., Payne v. United States,* 697 A.2d 1229, 1234 (D.C.1997). Indeed, competent defense counsel would surely have objected to the evidence in question if the prosecution had sought to introduce it.